704 P.2d 238

**STATE of Arizona, Appellee,**

v.

**William Dabney VIA, Jr., Appellant.**

No. 6322.

Supreme Court of Arizona,
In Banc.

June 12, 1985.

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Diane D. Hienton, Asst. Attys. Gen., Phoenix, for appellee.

Cunningham, Tiffany & Hoffmann, P.A., Phoenix by John Foreman, for appellant.

CAMERON, Justice.

Defendant, William Dabney Via, Jr., was convicted by a jury of first degree murder, A.R.S. § 13–1105; three counts of theft of property valued in excess of $1,000, A.R.S. § 13–1802; and two counts of fraudulent schemes and artifices, A.R.S. § 13–2310. The trial court entered a judgment of guilty on all charges and defendant was sentenced as follows: life imprisonment without possibility of parole or release for twenty-five years on the murder conviction, A.R.S. § 13–703; ten years on the first theft count, A.R.S. § 13–702; fifteen years on the fraudulent schemes and artifices counts, A.R.S. §§ 13–604, –702; and twelve years on the remaining theft counts, A.R.S. §§ 13–604, –702. The sentence imposed for the first theft count was to run concurrently with the murder sentence, and the four other sentences were to run concurrent with one another but consecutive to the murder sentence. We have jurisdiction pursuant to Art. 6, § 5(3) of the Arizona

Constitution, and A.R.S. §§ 13–4031 and –4035.

Defendant raises nine issues on appeal:

1. Pertaining to A.R.S. § 13–3905, Arizona's detention statute:

 a. Is that statute unconsitutional on its face?

 b. Were its provisions violated under the facts of this case?

2. Did the trial court improperly refuse to sever the homicide count from those relating to credit card fraud?

3. Was the indictment in this case multiplicitous and/or duplicitous?

4. Did the trial court err in refusing to ask defendant's requested *voir dire* questions pertaining to the religious preferences of the veniremen?

5. Was an in-court identification of defendant tainted by an unduly suggestive out-of-court identification procedure?

6. Was a hearsay writing of the victim incorrectly admitted into evidence against defendant?

7. Did the trial court permit improper character evidence to be admitted against defendant?

8. Was the testimony of an expert witness on eyewitness identification improperly limited?

9. Did the trial court err in refusing to give defendant's requested jury instruction on eyewitness identification?

The facts follow. On 14 March 1983, John Madsen (the victim), a prominent Scottsdale, Arizona realtor, received a phone call from a "Ron Empie" concerning ten acres of recently inherited property he wished to sell. The caller stated that the parcel was located in the Pinnacle Peak area and that a home was erected upon it. The men ended their conversation by agreeing to meet at approximately 6:00 P.M. at a Denny's restaurant located at Scottsdale Road and Shea Boulevard.

The victim arrived at Denny's at the agreed upon time. Approximately ten minutes later, a neighbor observed him talking to a passenger while travelling north in his car on Scottsdale Boulevard. This was the last time he was ever seen alive. Two days later, his car was found in the long term parking garage at Sky Harbor International Airport in Phoenix. On 18 March, the police were informed that the victim's credit cards had been used in the Phoenix metropolitan area and in Tucson. One Tucson merchant, sensing something unusual about the credit card transaction, copied the license plate number of the white Chevrolet van driven by the purchaser. Subsequent checking revealed that the vehicle had been rented in Phoenix by defendant and that defendant's fingerprints were upon the credit sales' receipts bearing the victim's forged signature. Approximately eight months later, the victim's remains were found buried in a shallow grave in the desert north of Scottsdale. An autopsy revealed that he had been shot in the head from close range.

Several days after the victim disappeared, another realtor, Richard A. Funke, contacted the police after learning that the circumstances leading to the victim's disappearance were similar to one of his own recent experiences. Funke had received a phone call on 11 March 1983 from a "Richard Schibble." He claimed that he was from Flagstaff and that he recently inherited a large tract of land in the Pinnacle Peak area that he wished to sell. Funke testified that the call was highly unusual because he was a commercial realtor who received most of his business through referrals or solicitation. Furthermore, the caller claimed that he randomly picked Funke's name out of the Yellow Pages. Funke, however, did not have a Yellow Pages advertisement, and his one line listing was very inconspicuous. He nevertheless agreed to meet Schibble, who suggested that they meet at the Scottsdale Road Denny's at 6:00 A.M. on 14 March 1983. Funke kept the scheduled appointment. The two men met for approximately thirty minutes and parted ways after Funke declined Schibble's invitation to view the property. Funke later made both in and out-of-court identifications of defendant as the person with whom he had met.

### THE DETENTION STATUTE.

Defendant was temporarily detained pursuant to a court order issued in accordance with A.R.S. § 13–3905. He was made to shave, appear in a live lineup, be photographed and fingerprinted. Defendant contends that the statute authorizing his detention is unconstitutional on its face and that, therefore, the evidence obtained against him was the fruit of an illegal detention. Alternatively, he asserts that, under the facts of this case, its provisions were violated.

a. Is A.R.S. § 13–3905 unconstitutional on its face?

A.R.S. § 13–3905 reads as follows:

*Detention for obtaining evidence of identifying physical characteristics*

A. A peace officer who is engaged, within the scope of his authority, in the investigation of an alleged criminal offense punishable by at least one year in the state prison, may make written application upon oath or affirmation to a magistrate for an order authorizing the temporary detention, for the purpose of obtaining evidence of identifying physical characteristics, of an identified or particularly described individual residing in or found in the jurisdiction over which the magistrate presides. The order shall require the presence of the identified or particularly described individual at such time and place as the court shall direct for obtaining the identifying physical characteristic evidence. Such order may be issued by the magistrate upon a showing of all of the following:

1. Reasonable cause for belief that a specifically described criminal offense punishable by at least one year in the state prison has been committed.

2. Procurement of evidence of identifying physical characteristics from an identified or particularly described individual may contribute to the identification of the individual who committed such offense.

3. Such evidence cannot otherwise be obtained by the investigating officer from either the law enforcement agency employing the affiant or the criminal identification division of the Arizona department of public safety.

B. Any order issued pursuant to the provisions of this section shall specify the following:

1. The alleged criminal offense which is the subject of the application.

2. The specific type of identifying physical characteristic evidence which is sought.

3. The relevance of such evidence to the particular investigation.

4. The identity or description of the individual who may be detained for obtaining such evidence.

5. The name and official status of the investigative officer authorized to effectuate such detention and obtain such evidence.

6. The place at which the obtaining of such evidence shall be effectuated.

7. The time that such evidence shall be taken except that no person may be detained for a period of more than three hours for the purpose of taking such evidence.

8. The period of time, not exceeding fifteen days, during which the order shall continue in force and effect. If the order is not executed within fifteen days, a new order may be issued, pursuant to the provisions of this section.

\* \* \* . \* \* \*

D. For the purposes of this section, "identifying physical characteristics" includes, but is not limited to, the fingerprints, palm prints, footprints, measurements, handwriting, handprinting, sound of voice, blood samples, urine samples, saliva samples, hair samples, comparative personal appearance, or photographs of an individual.

Defendant concedes that we upheld the constitutionality of the predecessor to A.R.S. § 13–3905 in *State v. Grijalva*, 111 Ariz. 476, 533 P.2d 533, *cert. denied*, 423 U.S. 873, 96 S.Ct. 141, 46 L.Ed.2d 104 (1975). He contends, however, that Grijalva needs to be reexamined in light of sub-

sequent United States Supreme Court authority which he claims casts serious constitutional doubt upon its continued vitality. In particular, defendant claims that the case of *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), makes it clear that the statute at issue is violative of the Fourth Amendment to the United States Constitution. We do not agree.

In *Dunaway*, the defendant was interrogated at a police station after having been taken into custody without judicial authorization and on less than probable cause. Under these facts, the United States Supreme Court reversed the defendant's conviction. *Dunaway* is distinguishable from the instant case in three respects. First, as indicated, the defendant in *Dunaway* was taken into custody on less than probable cause.[1] In the instant case, however, defendant concedes that there was probable cause to arrest him as to the counts in the indictment alleging credit card fraud and theft from the issuing banks.

Second, in *Dunaway* there was no prior judicial authorization. Our statute explicitly mandates that no detention order shall issue absent judicial authorization premised upon a detailed affidavit setting forth information from which a neutral and detached magistrate can make an informed decision. A.R.S. § 13–3905. As we stated in *Grijalva*, "[t]he key to the statute and its great strength is that a magistrate must make the necessary determinations." *Grijalva, supra* 11 Ariz. at 479, 533 P.2d at 536. The good, therefore, that the fourth amendment was designed to promote, protection of the citizen from arbitrary intrusions into his personal security by law enforcement officials, *see Pennsylvania v. Mimms*, 434 U.S. 106, 108–09, 98 S.Ct. 330,

332, 54 L.Ed.2d 331, 335 (1977), is not offended by the statute.

Third, the defendant in *Dunaway*, unlike the instant case, was subjected to interrogation. The statute at issue does not provide for interrogation of the person detained. The importance of this distinction was made clear in *Davis v. Mississippi*, 394 U.S. 721, 727, 89 S.Ct. 1394, 1398, 22 L.Ed.2d 676, 679 (1969), where the court differentiated between interrogation and fingerprinting:

> Fingerprinting involves none of the probing into an individual's private life and thoughts that marks an interrogation or search. Nor can fingerprint detention be employed repeatedly to harass any individual, since the police need only one set of each person's prints. * * * Finally, because there is no danger of destruction of fingerprints, the limited detention need not come unexpectedly or at an inconvenient time.

■■■■ We do not believe that *Dunaway* applies.[2] Neither do we believe, as defendant contends, that A.R.S. § 13–3905 is unconstitutional due to a lack of procedural safeguards. As noted above, before a person is detained an order must be obtained from a neutral magistrate. Under the statute, an individual, once detained, may be held for no longer than three hours and only to obtain certain judicially authorized types of evidence. The statute's validity is not defeated by its failure to provide that the detainee may have legal representation during his period of detention. The presence of counsel is not constitutionally mandated at such a pre-indictment phase. *State v. Tresize*, 127 Ariz. 571, 575, 623 P.2d 1, 5 (1980). Under these circumstances, the fourth amendment litmus test of reasonableness, *United States v. Chadwick*, 433 U.S. 1, 9, 97 S.Ct. 2476, 2482, 53

---

1. The statute, A.R.S. § 13–3905, speaks of reasonable cause. For our purposes in this case, probable cause and reasonable cause will be treated as the same. *Gortarez v. Smitty's Super Valu, Inc.*, 140 Ariz. 97, 103, 680 P.2d 807, 813 (1984).

2. We recognize that *Davis v. Mississippi, supra* at 727, 89 S.Ct. at 1398, 22 L.Ed.2d at 681, noted

that lineups, unlike fingerprinting procedures, are subject to abuses. We decline to address the question of whether a suspect, detained on less than probable cause, can be made to appear in a lineup. Such an inquiry is not germane to the facts of the instant case as we have determined that defendant was detained based upon probable cause.

L.Ed.2d 538, 547 (1977), is satisfied. We believe, therefore, that A.R.S. § 13–3905 sets forth the type of detainment procedure that the United States Supreme Court has suggested might pass constitutional muster if narrowly circumscribed. *Hayes v. Florida,* —— U.S. ——, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985). Thus, we will continue to adhere to our holding in *Grijalva, supra.*

b. Were the provisions of A.R.S. § 13–3905 violated under the facts of this case?

The affidavit used to obtain the order for defendant's detention stated as follows:

Your Affiant, Detective A.R. Scott # 3850 of the Phoenix Police Department, believes that reasonable cause does exist that a Forgery, a Felony, has been committed and that WILLIAM DABNEY VIA, JR., a white male, 2–28–56, is needed to provide handwriting samples to compare with the Mastercharge and Visa sales slips, a photograph of himself, clean-shaven, to stand in a live lineup and a complete set of finger and palm prints. Also, a videotape of lineup. These items are not otherwise available to your Affiant through the Phoenix Police Department or the Arizona Department of Public Safety.

At the time the affidavit was made, the body of the victim had not yet been found.

■ Defendant correctly maintains that, pursuant to A.R.S. § 13–3905, a nexus must be established between the person detained and the crime being investigated. *Grijalva, supra* 111 Ariz. at 479, 533 P.2d at 536. He argues that no such nexus existed under the facts of the instant case and that his detention was merely a pretext to improperly investigate crimes as to which probable cause did not exist: murder of and theft from the victim. In particular, he claims that Funke did not have any connection to the fraud counts, and, therefore, he was asked to identify defendant as part of a murder investigation conducted on less than probable cause.

■ We do not agree with defendant's premise that the identification made by Funke was used improperly. The victim disappeared after a meeting at Denny's relating to the sale of a recently inherited large tract of land in the Pinnacle Peak area. Immediately thereafter, the victim's credit cards were used in a series of fraudulent purchases. Funke had a meeting characterized by what he felt were very similar and highly "suspicious" circumstances. Given such similar facts, we believe that the police reasonably inferred that the victim's and Funke's encounters were part of a common scheme. Funke's identification of defendant as the man with whom he met was, therefore, probative as to the question of whom the victim met immediately before his credit cards were fraudulently used.

It was not fatal that Funke was not mentioned in the police affidavit used to obtain the A.R.S. § 13–3905 temporary detention order. Having satisfied the threshold showing of "reasonable cause" required by A.R.S. § 13–3905(A)(1), it became unnecessary to exceed that standard. Although we do not condone the practice of omitting facts from an affidavit, neither do we believe this constitutes reversible error where the omitted facts could only have strengthened the required showing, and the facts otherwise included satisfied the applicable standard. *See Franks v. Delaware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667, 682 (1978). We find no error.

## SEVERANCE

Defendant contends that the trial court erred in failing to grant his motion to sever the trial of the counts charging murder and robbery from those charging fraud and theft. We do not agree.

Our rules provide in pertinent part:

*Joinder*

a. *Offenses.* Provided that each is stated in a separate count, 2 or more offenses may be joined in an indictment, information, or complaint, if they:

(1) Are of the same or similar character; or

(2) Are based on the same conduct or are otherwise connected together in their commission; or

(3) Are alleged to have been a part of a common scheme or plan.

\* \* \* \* \* \*

Rule 13.3, Arizona Rules of Criminal Procedure, 17 A.R.S.

 Preliminarily, we note that the counts against defendant were properly joined in a single indictment. The crux of the State's case was that defendant killed the victim, perhaps for the purpose of obtaining the credit cards later used to make numerous purchases. Although the murder and robbery counts were dissimilar from the fraud counts, we believe that the state's version of defendant's crimes satisfied Rule 13.3's second and third tests for joinder: defendant's crimes were 2) based on the same conduct or were otherwise connected, and 3) part of a common scheme or plan. Joinder is proper where, as in this case, the crimes charged "were all part of a continuing series of events[.]" *State v. Mincey*, 115 Ariz. 472, 483, 566 P.2d 273, 284 (1977), *rev'd on other grounds*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *see also State v. Jones*, 120 Ariz. 556, 558, 587 P.2d 742, 744 (1978) ("A common scheme or plan is said to exist, for evidentiary purposes, if the proof of one crime tends to prove or establish the other.") Although the state failed to allege that the offenses were part of a common scheme or plan, such an explicit allegation is not required. *Jones, supra* at 558–59, 587 P.2d at 744–45. The joinder was proper.

Even though counts have been properly joined, our rules provide that they may nevertheless be severed under specified circumstances:

*Severance*

*a. In General.* Whenever 2 or more offenses \* \* \* have been joined for trial, and severance of any or all offenses \* \* is necessary to promote a fair determination of the guilt or innocence of any defendant of any offense, the court may on its own initiative, and shall on motion of a party, order such severance.

\* \* \* \* \* \*

Rule 13.4, Arizona Rules of Criminal Procedure, 17 A.R.S.

 Defendant had the burden of showing, at the time of his motion, that he would be prejudiced if the trial court refused to grant separate trials. *State v. Cruz*, 137 Ariz. 541, 544, 672 P.2d 470, 473 (1983). Such prejudice, if any, must be balanced against the countervailing consideration of judicial economy. *Id.* This burden, however, is not met where, as here, even had there been separate trials, evidence as to one set of charges would have been admissible at the trial on the other set "as part of the complete picture." *State v. Mincey, supra* 115 Ariz. at 483, 566 P.2d at 284. Furthermore, the trial court instructed the jury that it should consider the evidence going to each count separately. *See United States v. Morris*, 647 F.2d 568, 570–71 (5th Cir.1981). A fair determination of defendant's guilt or innocence was, therefore, not jeopardized by the trial court's refusal to sever. We find no error.

## MULTIPLICITY AND DUPLICITY

COUNTS III, IV, V, and VI of the indictment read as follows:

COUNT III: William Dabney Via, Jr., on or about the 15th day of MARCH, 1983, and the 16th day of MARCH, 1983, pursuant to scheme or artifice to defraud, knowingly obtained a benefit from ARIZONA BANK, 101 FIRST AVENUE, PHOENIX, by means of fraudulent pretenses, representation, promises or material omissions, in violation of A.R.S. §§ 13–2310, 13–701, 13–702, and 13–801.

COUNT IV: WILLIAM DABNEY VIA, JR., on or about the 15th day of MARCH, 1983, and the 16th day of MARCH, 1983, pursuant to scheme or artifice to defraud, knowingly obtained a benefit from GREAT WESTERN BANK, 4041 NORTH CENTRAL, PHOENIX, by means of fraudulent pretenses, representation, promises or material omissions, in

violation of A.R.S. §§ 13–2310, 13–701, 13–702, and 13–801.

COUNT V. WILLIAM DABNEY VIA, JR., on or about the 15th day of MARCH, 1983, and the 16th day of MARCH, 1983, knowingly obtained by means of a material misrepresentation, property or services of ARIZONA BANK, 101 FIRST AVENUE, PHOENIX, to-wit: U.S. CURRENCY, of a value of one thousand dollars or more, with the intent to deprive ARIZONA BANK of such property or services, in violation of §§ 13–1802, 13–1801, 13–701, 13–702 and 13–801.

COUNT VI. WILLIAM DABNEY VIA, JR., on or about the 15th day of MARCH, 1983, and the 16th day of MARCH, 1983, knowingly obtained by means of a material misrepresentation, property or services of GREAT WESTERN BANK, 4041 NORTH CENTRAL, PHOENIX, to-wit: U.S. CURRENCY, of a value of one thousand dollars or more, with the intent to deprive GREAT WESTERN BANK of such property or services, in violation of §§ 13–1802, 13–1801, 13–701, 13–702 and 13–801.

Defendant claims that counts III and IV, charging fraudulent schemes and artifices, were multiplicitous and counts V and VI, charging theft by material misrepresentation, were duplicitous. We do not agree.

The distinction between a multiplicitous and a duplicitous indictment has been stated as follows: "Multiplicity is defined as charging a single offense in multiple counts, whereas duplicity is charging multiple offenses in a single count." *State v. O'Brien*, 123 Ariz. 578, 582, 601 P.2d 341, 345 (App.1979). Defendant contends that counts III and IV are multiplicitous because count III charges a scheme or artifice to defraud the Arizona Bank, and count IV charges that the same crime was committed against the Great Western Bank. He urges that his acts constituted only one scheme or artifice to defraud such that the indictment charging two such offenses was defective.

Admittedly, the removal of the victim's credit cards constituted only one act. Defendant, however, subsequently embarked upon what could only be construed as two separate courses of conduct, each involving a distinct scheme to defraud a bank using a different credit card. The crime of fraudulent schemes and artifices requires that a defendant act with the specific intent to defraud. *State v. Haas*, 138 Ariz. 413, 418, 675 P.2d 673, 678 (1983). Defendant may have had the same general intent in each count—to defraud banks using stolen credit cards. There was, however, a specific and separate victim, as well as a specific and separate credit card, in each count. There was then specific intent to defraud twice, once as to each card and bank. Charging under two counts was not, therefore, multiplicitous.

Likewise, defendant's contention that counts V and VI were duplicitous is also without merit. Admittedly, these counts aggregate numerous separate and distinct thefts. The thefts alleged in these counts, however, did not relate to the various merchants from whom goods were purchased using the stolen credit cards. Rather, the thefts charged pertained to the two issuing banks. That these thefts implicated numerous merchants is of no consequence. *See People v. District Court*, 192 Colo. 355, 356, 559 P.2d 1106, 1107 (1977) ("[M]ere multiplicity of ownership and possessory interests does not cause a charge to be duplicitous."). Under such circumstances, where numerous transactions are merely parts of a larger scheme, a single count encompassing the entire scheme is proper. *See, e.g., United States v. Zeidman*, 540 F.2d 314 (7th Cir.1976). We find no error.

## VOIR DIRE

Defendant contends that the trial court committed reversible error in refusing to allow the inclusion, in a questionnaire directed to potential jurors, of questions relating to religious preferences. We disagree.

To simplify oral voir dire in this case, a questionnaire was first distributed to all potential jurors to elicit their responses to a number of basic questions. Among the questions requested by defendant were the following:

A. What is your religious preference, if any?

B. If you have a religious preference, would you characterize it as strong _____; moderate _____; or occasional _____?

Citing our state constitution, the trial judge prohibited the asking of these questions. Our constitution states, in pertinent part:

No religious qualification shall be required for any public office or employment, nor shall any person be incompetent as a witness or juror in consequence of his opinion on matters of religion, nor be questioned touching his religious belief in any court of justice to affect the weight of his testimony.

Ariz. Const. art. II, § 12.

The trial judge relied upon this provision of our state constitution to disallow the proffered questions. Recently, however, and after the trial court's ruling in this case, we stated:

The trial court may, at voir dire, question and excuse venire members who would not be impartial for any reason, religious or otherwise.

We note further that the phrase "nor be questioned concerning his religious belief in any court of justice to affect the weight of his testimony" does not refer to jurors. This phrase imposes limits on the questions that may be asked of *witnesses* to bolster or impeach their testimonies. Jurors do not provide testimony. This phrase does not apply to them.

The trial court did not abuse its discretion when it asked venire members if they had religious beliefs that would make it difficult or impossible for them to be impartial * * *.

*State v. Fisher*, 141 Ariz. 227, 249, 686 P.2d 750, 772 (1984) (footnote omitted).

The issue in *Fisher* was whether the trial court improperly asked questions of the venire members regarding their religious beliefs. We held that he did not. *Fisher*, however, does not resolve the related issue, of whether such questions *must* be asked when propounded by a defendant.

Our rule states:

d. *Voir Dire Examination.* The court shall conduct the *voir dire* examination, putting to the jurors all appropriate questions requested by counsel. The court may in its discretion examine one or more jurors apart from the other jurors.

If good cause appears, the court may permit counsel to examine an individual juror.

e. *Scope of Examination.* The examination of prospective jurors shall be limited to inquiries directed to bases for challenge for cause or to information to enable the parties to exercise intelligently their peremptory challenges.

Rule 18.5(d) and (e), Arizona Rules of Criminal Procedure, 17 A.R.S. This rule has been interpreted to leave the scope and extent of the voir dire examination to the sound discretion of the trial court. *State v. Smith*, 114 Ariz. 415, 418, 561 P.2d 739, 742 (1977). Only in the event of an abuse of this discretion will we reverse. *Id.*

 Like jury instructions, in determining whether the trial court abused its discretion in restricting the scope of voir dire, we will look to the entire voir dire examination to see if the questions have been adequately covered. In the instant case, the questionnaire contained numerous questions designed to uncover juror biases of a religious nature. For example:

There may be testimony that the deceased John Madsen, while married, was seeing another woman. Do any of you hold any personal, moral, or *religious* belief that could cause you to be unable to render a fair and impartial verdict based upon the law and evidence? [emphasis added]

We further note that although defendant's attorney was precluded from explicitly inquiring into religious preferences in

the questionnaire, neither attorney was prohibited from subsequently making related inquiries during individual voir dire examinations. For example, the prosecutor asked the following questions:

You have indicated that not only do you oppose the death penalty, but that you have very strong religious beliefs that you think may interfere with you sitting as a juror in this case; is that true?

\* \* \* \* \* \*

Mr. Marshall, the questionnaire indicated that there may be some testimony that the deceased in this case, John Madsen, was seeing another woman, other than his wife. And you indicated that because of some personal, moral or religious beliefs, that that fact might cause you to be unable to render a fair and impartial verdict in this case?

\* \* \* \* \* \*

Mr. McVay, these feelings that you hold [about marriage] are of a religious nature?

We believe the voir dire examination considered as a whole adequately touched upon juror biases such that defendant could intelligently exercise his "for cause" and peremptory challenges. Although defendant was prohibited from explicitly inquiring into religious preferences in his proposed questions, the record indicates adequate questioning concerning the jurors' religious beliefs as they related to the trial. Under these circumstances, we do not believe that the trial court's refusal to ask the questions propounded by defendant was error. *Hamling v. United States*, 418 U.S. 87, 138–40, 94 S.Ct. 2887, 2918–19, 41 L.Ed.2d 590, 633–34 (1974); *see also Pope v. United States*, 372 F.2d 710, 727 (8th Cir.1967) (no abuse of discretion where other questions asked "penetrated those very areas which the defense, by its proffered questions, sought to search"); *State v. Maxwell*, 151 Kan. 951, 102 P.2d 109 (1940) (voir dire sufficient where questions, in substance, sought to determine if one could not be a fair and impartial juror due to religious beliefs).

We further find the defendant's requested questions in the instant case were objectionable because of their degree of intrusiveness. In a capital case involving proposed voir dire questions almost identical to those at issue here, the Supreme Court of Virginia stated:

During the *voir dire* examination, Justus' counsel sought to propound the following questions: (1) "What is your religious preference?" (2) "Do you attend a local church?" (3) "Would you classify yourself as a regular or occasional attender?" The trial court refused these questions because they would invade a potential juror's privacy. We agree with the trial court.

\* \* \* \* \* \*

The defense counsel had the duty to identify a question's relevance to an actual or potential issue in the case. The trial court asked whether jurors held religious scruples about the death penalty. We hold that this is the proper extent of inquiry.

*Justus v. Commonwealth*, 222 Va. 667, 675–76, 283 S.E.2d 905, 910 (1981), *cert. denied*, 455 U.S. 983, 102 S.Ct. 1491, 71 L.Ed.2d 693 (1982). We agree with the Virginia court that questions concerning a potential juror's religious beliefs should be restricted to questions of relevance to the issues in the case.

We do not mean to imply that questions of a religious nature should never be asked. But even relevant questions about religion cannot be considered in a vacuum isolated from their impact upon the privacy interests of venire members. For a question concerning religious beliefs to be allowed, it must relate to issues or facts that may arise at trial. *See Coleman v. United States*, 379 A.2d 951, 954 (C.A.D.C. 1977) ("Inquiry as to a juror's religious beliefs is proper on voir dire where religious issues are presented expressly in the case, or where a religious organization is a party to the litigation \* \* \* "). The questions propounded by defendant in this case

were overly intrusive. As the Second Circuit Court of Appeals has noted:

> As to religion, our jury selections system was not designed to subject prospective jurors to a catechism of their tenets of faith, whether it be Catholic, Jewish, Protestant, or Mohammedan, or to force them to publicly declare themselves to be atheists. Indeed, many a juror might have a real doubt as to the particular religious category into which they could properly place themselves.

*United States v. Barnes,* 604 F.2d 121, 141 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980).

A review of the record in the instant case reveals that the trial court did not abuse its discretion in refusing to ask the questions proffered by defendant. We find no error.

### OUT–OF–COURT IDENTIFICATION PROCEDURES

Defendant contends that he was subjected to an unduly suggestive out-of-court identification procedure which tainted the in-court identification made of him. We do not agree.

The law enforcement authorities compiled a photographic lineup consisting of defendant's photograph and five others. Defendant claims that the lineup was defective in three regards: 1) he was the only one pictured who was smiling, 2) only he had significant facial hair growth, and 3) he was the only person who appeared college-like or "preppy." In a pretrial hearing conducted pursuant to *State v. Dessureault,* 104 Ariz. 380, 453 P.2d 951 (1969), defendant asserted these claims, but the trial court refused to suppress the in-court identification.

We first note that the issue of the photographic lineup's suggestiveness is not squarely before us because the chief witness for the prosecution, Richard Funke, was unable to pick defendant's photograph out of the array.

We have nonetheless examined all of the photographs, and we do not believe that defendant's photograph stands out or is otherwise unduly suggestive. Admittedly, there are subtle differences between defendant's photograph and the others. In particular, the other photographs depict men with mustaches or one to two days of whisker growth. The photograph of defendant, on the other hand, fully reveals his facial features but shows him with the beginnings of a full beard. We have held, however, that a photographic lineup is not unduly suggestive due to subtle differences in the photographs. *State v. Perea,* 142 Ariz. 352, 356, 690 P.2d 71, 75 (1984). *See also State v. Money,* 110 Ariz. 18, 21–23, 514 P.2d 1014, 1017–19 (1973) (in-person lineup not unduly suggestive despite minor differences as to height, weight, and hair length and where only defendant had a mustache); *State v. Martinez,* 121 Ariz. 62, 64–65, 588 P.2d 355, 357–58 (App.1978) (photographic lineup not unduly suggestive despite fact that all persons shown, with the exception of the defendant, had brown eyes); *State v. Bailes,* 118 Ariz. 582, 587, 578 P.2d 1011, 1016 (App.1978) (photographic lineup not unduly suggestive despite fact that only the defendant was disfigured with two blackened eyes and a broken nose).

Defendant maintains, however, that the out-of-court identification procedures employed in this case were unduly suggestive when viewed in their entirety. In particular, he points to the fact that he was the only person common to the photographic lineup and the subsequent live lineup, both of which were viewed by Funke. Although unable to pick defendant out of the photographic array, at the live lineup Funke positively identified defendant as the person with whom he met. Funke stated that he was able to identify the defendant at the live lineup because he viewed the defendant live and clean shaven. It is noted that the photograph was black and white and over three years old.

We agree that the procedures used in this case were unduly suggestive and with the Supreme Court of Minnesota which stated:

[W]e do not condone these unnecessarily suggestive procedures. If suspicion has focused on a particular individual and his picture is shown to the complainant along with others but the complainant does not identify the picture, a subsequent lineup, even though otherwise proper, is open to question when that individual is the only person in the lineup whose picture has recently been shown to the complainant. It would be a better practice in such a situation to eliminate the use of photos and proceed directly to the lineup, or to include in the group of pictures shown at least one or more pictures of persons other than the suspect who also subsequently appear in the lineup.

*State v. Webber*, 292 N.W.2d 5, 10 (Minn. 1980) (quoting *State v. Witt*, 310 Minn. 211, 213, 245 N.W.2d 612, 615 (1976).

We also agree with the manner in which this issue was resolved in *Webber*. There the court held that although the pretrial identification procedures were unduly suggestive, the defendant was not denied due process because there was no substantial likelihood that he would be misidentified. In particular, the court emphasized the distance from which the witness observed the defendant and her degree of certainty.

Similarly, under the "totality of the circumstances" in the instant case, we believe that Funke's identification of defendant was reliable:

[t]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972); *see also State v. McCall*, 139 Ariz. 147, 154, 677 P.2d 920, 927 (1984).

Funke stated that he focused his attention upon defendant for thirty minutes or longer from a distance of three to four feet. He further stated that he viewed defendant under good lighting conditions and when the restaurant was uncrowded. When asked if defendant was the person with whom he met, Funke stated that he had "[n]o doubt" and that he was "[v]ery confident" in his selection. Any error was non-prejudicial.

## HEARSAY

Defendant's next argument is that the trial court incorrectly allowed hearsay statements to be admitted into evidence against him. In particular, defendant urges that the trial court erroneously admitted a note written by the victim which described the property that Ron Empie (who the state claims was, in fact, defendant) offered for sale. It also contained Empie's name and the time and place of the proposed Denny's meeting.

Admittedly, the challenged statements were hearsay within the definition of that term: " '[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), Arizona Rules of Evidence, 17A A.R.S. Hearsay is generally inadmissible. Rule 802. The state argues, however, that the writing in question was admissible under an exception to the hearsay rule which provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \* \* \* \*

(3) *Then existing mental, emotional, or physical condition.* A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Rule 803(3), Arizona Rules of Evidence, 17A A.R.S.

The state relies upon *State v. Adamson,* 136 Ariz. 250, 665 P.2d 972, *cert. denied,* 464 U.S. 865, 104 S.Ct. 204, 78 L.Ed.2d 178 (1983) which applied this exception to a fact pattern similar to that before us. In *Adamson,* the deceased victim had written a note detailing an appointment that he had made with the defendant:

> John Adamson
> Lobby at 11:15
> Clarendon House
> 4th & Clarendon

*Id.* at 256, 665 P.2d at 978. The defendant argues that this and a similar note were improperly admitted. We rejected this argument, stating:

> Adamson's final argument is that the trial court erred in admitting the notes since they were hearsay because they were used to show Bolles' intent to meet the defendant at the scene of the bombing. While this may be true, Arizona follows the state of mind exception to the hearsay rule which is applicable to the victim's notes.

*Id.* at 257, 665 P.2d at 979 (citations omitted).

Defendant, however, seeks to distinguish *Adamson* by asserting that the hearsay utterances in that case tended to establish the defendant's presence at the scene of the crime while those in the instant case did not. We believe that defendant has misconstrued this hearsay exception and our holding in *Adamson.* Both stand for the proposition that hearsay statements are admissible to show that a *declarant* acted in accordance with his stated intention to be at a certain place at a certain time. 4 M. Berger & J. Weinstein, *Weinstein's Evidence,* § 803(3)[04] (1984); *see generally,* J. Livermore & M. Udall, *Arizona Practice, Law of Evidence* § 128 (2d ed. 1982). The purpose of the exception is "to render statements of intent by a declarant admissible only to prove his future conduct, not the future conduct of another person." *See* Historical Note to Fed.R.Evid. 803. Insofar as the statements in this case had

some bearing on the issue of defendant's conduct and whereabouts, however, they were nevertheless admissible. Numerous cases have allowed the introduction of such statements if they primarily relate to the declarant's state of mind. *See Mutual Life Insurance Co. v. Hillmon,* 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892); *United States v. Pheaster,* 544 F.2d 353 (9th Cir. 1976), *cert. denied,* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977); *People v. Alcalde,* 24 Cal.2d 177, 148 P.2d 627 (1944). *See also* Advisory Committee's Note, Fed. R.Evid. 803(3) ("The rule of *Mutual Life Ins. Co. v. Hillmon* allowing evidence of intention as tending to prove the doing of the act intended, is of course, left undisturbed.")

In the instant case, testimony was adduced at trial that, on the day of the victim's disappearance, defendant met with Richard Funke at a Denny's Restaurant to discuss a real estate transaction. The primary purpose of the contested hearsay statements was to establish the victim's presence at the same Denny's, for the same purpose, later that day and immediately before the victim's disappearance. Under these circumstances, we believe that the statements were both relevant and admissible as coming under an exception to the rule against hearsay. Rules 401–02, 803(3), Arizona Rules of Evidence, 17A A.R.S. We find no error.

## PRIOR ACTS TESTIMONY

Defendant maintains that the trial court committed reversible error in allowing the admission of grossly prejudicial and irrelevant character evidence. We disagree.

The defendant's girlfriend, Rose Bahe, was granted immunity for her testimony. When called as a witness by the state, she testified that defendant showed her a rifle on two occasions prior to the murder and that he taught her how to operate it on the second occasion. She further testified that defendant told her that he went to Tucson in March of 1983 (around the time the murder is alleged to have occurred) for the

purpose of purchasing marijuana but that the deal fell through.

■ Our rules of evidence provide:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Rule 404(b), Arizona Rules of Evidence, 17A A.R.S. The list of relevant purposes for which evidence of other crimes, wrongs or acts may be admitted is not exhaustive. If offered for a non-character purpose, the evidence is admissible. *See* 2 M. Berger & J. Weinstein, *supra,* at § 404[08].

The trial court overruled defendant's objections to the evidence and stated the following:

As to your motion in limine regarding the gun, I don't see that that is character evidence. I find that it is probative regarding the accused's knowledge of weapons.

Therefore, the motion in limine as to that matter is denied.

\* \* \* \* \* \*

Again, I have great difficulty in ascertaining that that statement [about marijuana] would go to character. It seems to me it is more of an alibi in response to the question, "where have you been, what have you been doing."

I do find it relevant, and I do not find that there is any great prejudice to the defendant regarding allowing Ms. Bahe to testify as to that.

Therefore, that motion in limine is also denied.

■ Because a trial court is best able to balance the probative value versus the prejudicial effect of "other crimes, wrongs, or acts" evidence, it is invested with considerable discretion in deciding whether to admit such evidence. *See State v. Brown,* 125 Ariz. 160, 162, 608 P.2d 299, 301 (1980). We do not believe it abused

this discretion. In the instant case, the murder was committed using a handgun. Defendant's access to and knowledge of guns was clearly relevant. Rule 401, Arizona Rules of Evidence, 17A A.R.S.

Defendant points out, however, that Bahe testified that defendant showed her a rifle but never a handgun. On the other hand, the detective who interviewed Bahe, testified that she indicated to him that defendant had also shown her a handgun. We believe, however, that this discrepancy, and uncertainty as to when the gun incidents occurred, went to the weight, not the admissibility, of the testimony. *See State v. Jeffers,* 135 Ariz. 404, 418, 661 P.2d 1105, 1119, *cert. denied,* 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983).

We also find no fault with the testimony regarding the alleged marijuana purchase that fell through. The state contended that defendant went to Tucson to use the credit cards he stole from the victim and that he concocted the marijuana story to cover up his more serious criminal conduct. Under these circumstances, the testimony was admissible "as evidence completing the story for the jury." *State v. McCall, supra,* 139 Ariz. at 153, 677 P.2d at 926. We also fail to see how defendant was prejudiced by evidence of conduct which provided him with an alibi.

Prejudice was further minimized by the trial court's sua sponte request that the jury be told that the marijuana deal fell through. Last, even if introduction of the evidence was error, it was harmless as dealing with conduct far less egregious than that with which defendant was charged. *State v. Watkins,* 126 Ariz. 293, 299, 614 P.2d 835, 841 (1980). We find no error.

## EXPERT TESTIMONY ON EYE-WITNESS IDENTIFICATION

Defendant contends that the trial court improperly limited the testimony of an expert on eyewitness identification. We do not agree.

Defendant presented the testimony of an authority on eyewitness identification, Dr. Elizabeth Loftus. She testified as to the variables affecting the accuracy of eyewitness identifications and to the empirical studies done in the field. The trial court, however, precluded her from testifying as to an informal test she had conducted. She performed the test at airports and on board a plane en route to Phoenix to testify. The test involved providing fifteen persons with a photograph of the live lineup and a description of defendant. Dr. Loftus would have testified that fourteen of those tested picked defendant as the person described to them.

Defendant maintains that the trial court's ruling violated our holding in *State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983). In *Chapple*, we held that a trial court erred in precluding the same Dr. Loftus from testifying. Our holding was, however, limited to the peculiar circumstances of that case, including the fact that, "[n]o direct or circumstantial evidence of any kind connect[ed] defendant to the crime, other than the testimony of [the eyewitnesses] * * *." *Id.* at 285, 660 P.2d at 1212 (footnote omitted). We specifically stated that "[t]he rule in Arizona will continue to be that in the usual case we will support the trial court's discretionary ruling on the admissibility of expert testimony on eyewitness identification." *Id.* at 297, 660 P.2d at 1224. Likewise, we believe it was within the trial court's discretion to preclude testimony not conforming to or exceeding that held admissible in *Chapple*.

We do not believe that the trial court erred under the facts of the instant case. The obvious import of the proferred testimony was that the live lineup used in this case was unduly suggestive, a matter decided adverse to defendant in the *Dessureault* hearing. *Chapple*, however, does not sanction such testimony. On the contrary, one of the factors we emphasized in *Chapple* was that:

The testimony offered was carefully limited to an exposition of the factors affecting reliability, with experimental data supporting the witness' testimony and *no attempt was made to have the witness render opinions on the actual credibility or accuracy of the identification witnesses. Issues of ultimate fact may be the subject of expert testimony, but witnesses are not "permitted as experts on how juries should decide cases."* Ariz.R. of Evid. 704 comment. *Id.* at 295, 660 P.2d at 1222 (emphasis added).

We have also examined the progeny of *Chapple* and have been unable to find a case mandating admissibility of the type of testimony proferred by defendant. Rather, these cases stand for the proposition that general testimony as to the variables affecting eyewitness identification is permissible, but within the discretion of the trial court. *See United States v. Downing*, 753 F.2d 1224 (3rd Cir.1985); *United States v. Smith*, 736 F.2d 1103 (6th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984); *State v. Poland*, 144 Ariz. 388, 698 P.2d 183 (1985); *People v. McDonald*, 37 Cal.3d 351, 690 P.2d 709, 208 Cal.Rptr. 236 (1984). We find no error.

## JURY INSTRUCTIONS

Defendant asserts that the trial court erred in not giving his proposed instructions on eyewitness identification.

The instruction which the trial court actually gave on witness credibility was the following:

In order to determine the facts in this case, you must determine how much credit you will give to what each witness said. In other words, how accurate and reliable was his or her testimony? In making this determination, you may consider the following factors:

1. The ability of the witness to see or hear accurately or to know the things he or she testified about in the courtroom;

2. The manner of the witness while testifying;

3. Whether the witness seemed to have an accurate memory;

**124**

4. Whether the witness had some interest in how the case should be decided;

5. Whether the witness appeared to have any motive, bias or prejudice which might affect the reliability of what the witness said; and

6. Whether the witness made any inconsistent statements before the trial or during the trial.

You should consider the testimony of each witness in light of all the evidence in the case.

Jurors were further instructed that they must find defendant innocent if they harbored reasonable doubts as to his guilt.

█ Defendant objected to the trial court's refusal to give instead an instruction adopted from *United States v. Telfaire*, 469 F.2d 552, 558–59 (D.C.Cir.1972). We note, however, that this instruction was only suggested by the D.C. court and not required in every case. *Id.* at 557. Rather, it was part of a suggested set of instructions contained in an appendix. In any event, the instruction was adequately covered by other instructions. *State v. Villafuerte*, 142 Ariz. 323, 329, 690 P.2d 42, 48 (1984). We find no error.

█ The trial court also refused to give a suggested reasonable doubt instruction:

The burden is on the State to prove beyond a reasonable doubt that the defendant is the person who committed the offense with which he is charged.

If, after considering the circumstances of the identification and all the other evidence in this case, you have a reasonable doubt whether defendant was the person who committed the offense, you must give the defendant the benefit of that doubt and find him not guilty.

This instruction was an adaptation of one routinely used in California criminal trials. California Jury Instructions—Criminal Instructions Number 2.91 (1982 Revision). The Supreme Court of California has held, however, that failure to give this instruction is not error where, as in the instant

case, the jury was otherwise instructed as to reasonable doubt and witness credibility. *People v. Blair*, 25 Cal.3d 640, 663, 602 P.2d 738, 752–53, 159 Cal.Rptr. 818, 832–33 (1979). Under these circumstances, the court held:

Here the court gave * * * general instructions, and it also told the jury that if they had a reasonable doubt that defendant was present when the crimes were committed, they should find him not guilty. It was unmistakable to the jury that defendant was challenging the reliability of [the witness'] identification, and these instructions were sufficient to inform them that the prosecution had the burden of proof on that issue and that defendant should be acquitted if they had a reasonable doubt on the matter.

*Id.* (footnote and citation omitted). *See also State v. Villafuerte*, 142 Ariz. 323, 329, 690 P.2d 42, 48 (1984) (a particular instruction need not be given where others, actually given, adequately set forth the law); *People v. Richardson*, 148 Cal.Rptr. 120, 124–26, 83 Cal.App.3d 853, 860–62 (1978) (court not required to give CALJIC No. 2.91 where general instructions on reasonable doubt and credibility sufficiently informed the jury of the test they were to apply to the identification evidence).

The instructions given in the instant case adequately apprised the jury of the applicable law. We find no error.

We have reviewed the entire record pursuant to A.R.S. § 13–4035 for reversible error and have found none. The judgments and sentences are affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and FELDMAN, JJ., concur.