NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

STATE OF ARIZONA, *Appellee,*

*v.*

CHRISTOPHER MICHAEL RUSSO, *Appellant.*

No. 1 CA-CR 15-0042
FILED 2-18-2016

---

Appeal from the Superior Court in Maricopa County
No. CR2009-007734-001
The Honorable Pamela S. Gates, Judge

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Chris DeRose
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Terry Reid
*Counsel for Appellant*

---

## MEMORANDUM DECISION

Presiding Judge Peter B. Swann delivered the decision of the court, in which Judge Lawrence F. Winthrop and Judge Donn Kessler joined.

---

**S W A N N**, Judge:

**¶1** Christopher Michael Russo ("Defendant") appeals his convictions and sentences for first degree murder, aggravated assault, and two counts of kidnapping. He argues that the trial court committed fundamental error in two respects: first, by allowing witnesses to testify that he was a drug dealer; and second, by permitting the state to refer to his hands and feet as dangerous instruments in support of the allegation of dangerousness for one of the kidnapping charges. We conclude that Defendant failed to establish fundamental error and resulting prejudice. We therefore affirm.

## FACTS[1] AND PROCEDURAL HISTORY

**¶2** In 2009, Defendant, a drug dealer, and his girlfriend, C.H., lived in various hotel rooms in Anaheim, California, with another woman, S.W. Defendant paid for the rooms and "everything." In addition, he provided C.H. and others with methamphetamine.

**¶3** Defendant was also physically abusive towards C.H., and he maintained tight control over her friendships, especially with men. He once angrily confronted a male friend of C.H.'s, telling him that if the friend ever contacted or met with C.H. or if C.H. left Defendant, he would "find her and put her six feet deep." On July 5, 2009, C.H. attempted to end her relationship with Defendant by driving to Arizona with her friend T.M., one of Defendant's customers; the two women rented a hotel suite in Tempe. Defendant was "pissed off," and he repeatedly called and texted both women demanding that they return.

**¶4** In the early morning of July 8, 2009, C.H. met a man, J.O., at a convenience store. C.H. and J.O. attended a party, then returned to the suite

---

[1] We view the facts in the light most favorable to sustaining the verdicts and resolve all reasonable inferences against Defendant. *See State v. Kiper*, 181 Ariz. 62, 64 (App. 1994).

where they slept together in the bedroom. Later that evening, T.M., who was also in the suite, opened the front door to leave and encountered Defendant.[2] He went to the bedroom, and T.M. left the hotel.

¶5        Defendant pounded on the locked bedroom door, and when C.H. opened it, J.O. "saw a fist come through the door and hit [C.H.] in the face and she fell flat on the ground." Defendant continued to repeatedly punch and kick her in the face and ribs. As he was assaulting her, Defendant repeatedly asked, "Do you think you can just run away from me[?]"

¶6        He then turned to J.O. and punched and kicked him in the face and "tased" him multiple times, rendering J.O. immobile. J.O. sustained wounds to his face and head.

¶7        While Defendant's attention was focused on J.O., C.H. attempted to crawl away. Defendant used a stun gun on her multiple times and continued to kick and punch her for 15 to 20 minutes. As he paused in assaulting C.H., Defendant took a knife, pointed it at J.O., and threatened to "take out [J.O.'s] eye with it." Defendant returned to C.H. and poured water on her face causing her to choke. When she attempted to push herself up from the floor to get away, Defendant punched her in the face. She stopped breathing and moving.

¶8        Defendant suddenly became friendly with J.O. and provided him with water and clean clothes. As Defendant copied the address from J.O.'s driver's license, Defendant told him: "This [doesn't] need to get out in the open. I know where you live. I have all your information. Nobody needs to know about this. "

¶9        T.M. returned to the suite, and she briefly observed C.H. lying on the floor of the bloody bedroom covered in a blanket. Over J.O.'s objection, T.M. and Defendant drove J.O. home. T.M. then drove Defendant to purchase cleaning supplies. Upon returning to the hotel room, T.M. approached C.H. and noticed her face was bruised, she had no pulse, her body was cold, her lips were purple, and her eyes were black and "sunken in." Assuming Defendant had killed C.H., T.M. "freaked out" and requested pills from him to calm herself down.

---

2        Defendant had earlier called T.M. and told her he was coming to Arizona. In turn, T.M. informed C.H. of his impending arrival, but C.H. did not "believe he was coming." The record does not indicate how Defendant knew where to find them in Arizona.

¶10　　　　As T.M. slept, Defendant cleaned the crime scene and packed their belongings. At some point, T.M. briefly woke up and observed him carrying a large bundle of sheets and blankets large enough to contain C.H. to T.M.'s car. He returned with her vehicle a few hours later, and the two collected C.H.'s belongings and drove back to California. C.H. did not return to California with them, and she has not been seen since.[3]

¶11　　　　On the way to California, Defendant and T.M. were stopped by law enforcement for a traffic violation. T.M. mentioned nothing to the officer about her suspicion that Defendant had killed C.H. After arriving in California, T.M. remained silent about her suspicion until she was certain Defendant was no longer in the area, at which point she confided in C.H.'s uncle.

¶12　　　　The ensuing police investigation eventually tied Defendant to the assaults and resulting death of C.H. The state charged him with one count of first degree murder, a class 1 dangerous felony; two counts of kidnapping, class 2 dangerous felonies; and aggravated assault, a class 3 dangerous felony. The state alleged that Count 3, the kidnapping charge for J.O., was "a dangerous felony because the offense involved the discharge, use, or threatening exhibition of [Defendant's] hands and/or knife, a deadly weapon or dangerous instrument and/or the intentional or knowing infliction of serious physical injury upon [J.O.]." The state argued in closing that Defendant's use of his hands and feet, the knife, and J.O.'s injuries resulting from Defendant's physical attack all supported the allegation of dangerousness for Count 3.

¶13　　　　The jury found Defendant guilty as charged, and the court imposed a combination of concurrent and consecutive prison sentences, the longest of which is natural life for the murder conviction. He timely appeals.

## DISCUSSION

¶14　　　　Defendant argues that testimony regarding his drug dealing constitutes improper other-act evidence and should have been precluded. He also contends, for purposes of challenging his sentence, that the jury's finding of dangerousness in Count 3 may not have been unanimous because the state's argument that his hands and feet were dangerous instruments was incorrect as a matter of law; some jurors may have

---

[3]　　　　As of the time of trial, C.H.'s remains had not been discovered.

concluded the offense was dangerous based solely on Defendant's hands and feet instead of the knife.

**¶15** Because Defendant raised neither of these objections at trial we review both issues for fundamental error. *See State v. Henderson*, 210 Ariz. 561, 567, ¶ 19 (2005). Under this standard of review, Defendant "bears the burden to establish that (1) error exists, (2) the error is fundamental, and (3) the error caused him prejudice." *State v. James*, 231 Ariz. 490, 493, ¶ 11 (App. 2013) (internal quotations and citations omitted).

## I. OTHER-ACT EVIDENCE: RULE 404(B)

**¶16** Arizona Rule of Evidence 404(b) prohibits evidence of other acts "to prove the character of a person in order to show action in conformity therewith" but allows such evidence "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ariz. R. Evid. 404(b). "The list of 'other purposes' in Rule 404(b) . . . is not exclusive; if evidence is relevant for any purpose other than that of showing the defendant's criminal propensities, it is admissible even though it refers to his prior bad acts." *State v. Jeffers*, 135 Ariz. 404, 417 (1983).

**¶17** Other-act evidence is admissible if (1) the evidence is admitted for a proper purpose, (2) the evidence is relevant, (3) the evidence is not unfairly prejudicial under Rule 403, and (4) the judge gives "an appropriate limiting instruction upon request." *State v. Nordstrom*, 200 Ariz. 229, 248, ¶ 54 (2001), *abrogated on other grounds by State v. Ferrero*, 229 Ariz. 239, 243, ¶ 20 (2012). In addition, the state must prove by clear and convincing evidence that the other act occurred and the defendant committed the act.[4] *State v. Terrazas*, 189 Ariz. 580, 584 (1997).

**¶18** The evidence of Defendant's drug dealing was not admitted to show he is an aggressive and violent person with the propensity to murder, kidnap, and assault the victims in this case. Instead, the evidence was relevant to counter his argument at trial that he flew to Arizona out of concern for C.H.'s well-being. The record establishes that he was jealous

---

[4] Defendant contends the trial court did not apply this standard to the evidence of his drug dealing. The court did not do so because, as Defendant correctly notes, the state did not provide notice that it intended to admit 404(b) evidence, and he did not otherwise object to the evidence of his drug dealing. The trial court informed the jury, however, that it could consider other-act evidence only if it found clear and convincing evidence that Defendant committed the act.

and controlling in his relationship with C.H. One of the means by which he controlled C.H. was by keeping her supplied with methamphetamine. His drug dealing was relevant to explain T.M.'s failure to immediately report her suspicion that Defendant murdered C.H., a failure that defense counsel argued exculpates him. T.M. was using drugs supplied by Defendant. By reporting him to police, not only could she have faced the legal consequences of her unlawful drug use, but she could also have put her access to drugs at risk.

¶19        T.M.'s reliance on Defendant as her drug dealer also helps explain why she allowed him access to the hotel room she shared with C.H. despite knowing "something [bad] would probably happen[.]" The record establishes that T.M. had run out of methamphetamine by the time Defendant appeared at the room, and she wanted the drug. Had she confronted him or otherwise denied him access to the room, she would risk her opportunity to readily obtain methamphetamine. This conclusion counters Defendant's explanation at trial that T.M. invited him into the room to assist in dealing with C.H.'s death purportedly caused by an overdose of drugs obtained at the party she attended with J.O.

¶20        Accordingly, evidence of Defendant's drug dealing was not offered to prove his violent character and propensity to commit murder, aggravated assault, and kidnapping. Rather, the evidence was relevant and admitted for the proper purpose of rebutting his defense. In light of the other trial evidence establishing his guilt — especially T.M.'s eyewitness testimony and J.O.'s account of Defendant's assault on him and C.H. — the evidence was not unduly prejudicial under Rule 403. *See State v. Via*, 146 Ariz. 108, 122 (1985) (finding any error in admitting evidence of prior attempted drug deal was harmless because that conduct was "far less egregious than that with which defendant was charged"). Finally, because the trial court instructed the jury not to consider other-act evidence to determine Defendant's character or that he acted in conformity with his character and therefore committed the charged offenses, he cannot meet his burden to establish prejudice resulting from the admission of this evidence.[5] *See State v. Newell,* 212 Ariz. 389, 403, ¶ 68 (2006) (jurors are presumed to follow court's instructions).

---

[5]        Defendant only argues he was prejudiced because the record supported his argument that C.H. died as a result of an overdose, and the evidence about his being a drug dealer influenced the jury to disregard the evidence that C.H. died from an overdose rather than his attack on her. The

¶21 Defendant fails to establish that the trial court committed error, fundamental or otherwise, in not *sua sponte* striking evidence that he was a drug dealer. He also fails to establish any resulting prejudice. No reversible error occurred.

## II. DANGEROUSNESS: HANDS AND FEET

¶22 As noted, the jury found Count 3 was a dangerous offense based on the state's allegation that Defendant used his hands, feet, or a knife during J.O.'s kidnapping. "'Dangerous offense' means an offense involving the discharge, use or threatening exhibition of a deadly weapon or dangerous instrument or the intentional or knowing infliction of serious physical injury on another person." A.R.S. § 13-105(13). A dangerous instrument is "anything that under the circumstances in which it is used, attempted to be used or threatened to be used is readily capable of causing death or serious physical injury." A.R.S. § 13-105(12).

¶23 We agree with Defendant that the state's reference to his hands and feet as dangerous instruments was incorrect as a matter of law. *See State v. Gordon*, 161 Ariz. 308, 309-11 (1989) (holding trial court erred in enhancing defendant's kidnapping and sexual assault sentences based on jury's finding that defendant's fists constituted dangerous instruments). However, in support of the allegation of dangerousness in Count 3, the state also alleged and presented evidence of his use of a knife during the kidnapping.[6]

¶24 Defendant does not challenge the finding of dangerousness based on his use of the knife during the kidnapping of J.O.; rather, he argues insufficient evidence establishes that the stun-gun is a dangerous instrument. But the state expressly informed the jury during closing

---

jury, however, weighs the evidence, not this court. *State v. Guerra*, 161 Ariz. 289, 293 (1989).

[6] After trial, but before sentencing, the state moved to dismiss the jury's findings of dangerousness and use of a dangerous instrument or deadly weapon for Count 2 (kidnapping of C.H.) because Defendant was alleged to have *only* used his hands and feet as dangerous instruments in that count. Accordingly, the trial court entered a judgment of guilt on Count 2 as a non-dangerous offense. Because Count 3 also alleged his use of a knife as a dangerous instrument or deadly weapon, the state expressly did not request to dismiss the jury's finding of dangerousness for that count.

arguments that the stun-gun was not the basis for the dangerousness allegation.

¶25 Based on Defendant's use of the knife in conjunction with his contemporaneous threat to take out J.O.'s eye with it, no reasonable juror would fail to conclude the knife was a dangerous instrument. Accordingly, although it was error to permit the state to refer to his hands and feet as dangerous instruments, he fails to establish any resulting prejudice. *See State v. Hampton*, 213 Ariz. 167, 182, ¶¶ 71-74 (2006) (holding that, although trial court erred in imposing an aggravated sentence when jury did not find that gun used in murder was a dangerous instrument, the error was harmless because, based on the trial evidence, "no reasonable jury could have failed to find that a deadly weapon was used in the commission of the offense."). Thus, we find no reversible fundamental error.

## CONCLUSION

¶26 For the foregoing reasons, we affirm Defendant's convictions and sentences.



Ruth A. Willingham · Clerk of the Court
FILED: ama