Americans Be Independent, James E. Tolleson and Rodney W. Tolleson, Appellants, *v.* Commonwealth of Pennsylvania, Acting by Attorney General J. Shane Creamer, Appellee.

Argued September 6, 1973, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*James H. Joseph,* with him *Donald S. Hershman* and *Baskin, Boreman, Wilner, Sachs, Gondelman & Craig,* for appellants.

*George S. Test,* Deputy Attorney General, for appellee.

OPINION BY JUDGE KRAMER, June 19, 1974:

This is an appeal filed by Americans[1] Be Independent, James E. Tolleson and Rodney W. Tolleson (hereinafter referred to collectively as Tollesons and individually by their given and surnames) from an order of the Court of Common Pleas of Erie County, dated January 18, 1973 wherein the Tollesons and Koscot Interplanetary, Inc. (Koscot) were ordered to pay, jointly and severally, the sum of $55,000 as civil penalties for violation of an order of that court dated March 25, 1971.[2]

This case had its beginning on December 1, 1970 when the Commonwealth of Pennsylvania (Commonwealth) through its Attorney General filed a complaint in equity against Koscot, as the sole defendant, alleging violations by Koscot of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (hereinafter Act), Act of December 17, 1968, P. L. 1224, §1 et seq., as amended, 73 P.S. §201-1 et seq. The complaint alleged that Koscot had commenced its business in the Commonwealth of Pennsylvania on or about January 1, 1969, and that due to certain Koscot business activities, a conference was held with officials of the Commonwealth after which, Koscot on July 1, 1969, entered into an Assurance of Voluntary Compliance which in essence was an agreement on behalf of Koscot to cease and desist from certain referral selling busi-

---

[1] The Tollesons in this appeal, and the court below, used the plural term "Americans Be Independent." The record in this case and other related Tolleson cases indicate that the singular term "American Be Independent" was more often used. In any event, they are one and the same.

[2] The filing of this opinion was intentionally delayed so that it could be filed simultaneously with the opinions and orders of this Court in other cases coming within the original jurisdiction of this Court wherein the Commonwealth brought suit against the Tolleson brothers. The purpose of the delay was to avoid any prejudice to the rights or positions of any of the parties.

ness activities. The complaint alleged that Koscot violated the Assurance of Voluntary Compliance in addition to other allegations of violations of the Act. After hearing, President Judge EDWARD H. CARNEY of the Court below rendered an opinion and issued an order dated March 25, 1971 whereby Koscot ". . . a Florida Corporation, or under any other name or designation, and respondent's [Koscot's] representatives, agents and employees, directly or through any corporate or other device, . . ." were directed to cease and desist from:

"(1) Paying, or promising to pay, any fee, compensation, reward or other consideration, either directly or indirectly, to a distributor, sub-distributor, supervisor, director, or beauty advisor, or to any other person who shall purchase a position in the distribution system of Koscot Interplanetary, Inc. for the procurement of a contract of purchase of a distributorship, sub-distributorship, or other similar position by another person or for bringing said other person into the Koscot distribution system.

"(2) Making representations through its representatives, officers, agents, servants, employees, distributors, sub-distributors, directors, supervisors, or beauty advisors, in its manuals, at Golden Opportunity meetings, or elsewhere relating to earnings which are not based upon the experience of a substantial number of persons engaged in the Koscot program.

"(3) Utilization of any advertisement or promotional device which would in any way be a misrepresentation or cause a likelihood of confusion.

"(4) Conducting business in the Commonwealth of Pennsylvania through any deceptive act or practices, or through any and all acts in aid or furtherance of said deceptive acts or practices.

"(5) Violating the provisions of the Pennsylvania Unfair Trade Practices and Consumer Protection Law by any direct or indirect means.

"(6) Engaging in any activity which would violate the other provisions of the injunction, either directly or indirectly.

"Nothing herein contained shall affect the obligation of the respondent as set forth in the Assurance of Voluntary Compliance, effective July 1, 1969 and recorded at 1941 A 1969 in the Court of Common Pleas of this county. Furthermore, this court shall retain jurisdiction over the respondent for the purpose of enforcing this injunction, including the assessment of Civil Penalties, as provided for in Section 8 of the Unfair Trade Practices and Consumer Protection Law." Koscot filed exceptions to the court's findings of fact and conclusions of law and these were dismissed by the court below on June 15, 1971. No appeal was taken.

For a complete understanding of this case, we believe it is necessary to set forth in some detail (taken from the lower court's unappealed findings of fact) the activities of Koscot which led to the Commonwealth's complaint. Koscot was incorporated in the State of Florida in the year 1967. It began doing business in Pennsylvania in the latter part of 1967 or early 1968. Ostensibly it was in the business of marketing cosmetics and other similar products. It created a network of distributors and sub-distributors throughout a number of states. In addition, there were retail sales personnel, known as beauty advisors, to sell the cosmetics. The cosmetics were of a good quality, equal to competitively-priced products. Koscot carried on the usual advertising activities. As of January 1, 1971, it had sold 503 distributorships and 343 sub-distributorships in Pennsylvania. The cost for purchasing a distributorship was $4,500 and for a sub-distributorship $1,000. Koscot had a self-imposed quota for Pennsylvania of 1,500 distributorships, or one for each 7,000 of the population. Koscot paid distributors and sub-distributors for bringing other distributors and sub-dis-

tributors into the Koscot system. In Pennsylvania, a distributor who brought in another distributor received $2,650 from the fee of $4,500. A distributor who brought in another sub-distributor received $650 out of a $1,000 fee. As part of its program to build an organization, Koscot prepared a system of "Golden Opportunity Meetings" for the purpose of enticing prospective distributors and sub-distributors into purchasing a distributorship or sub-distributorship. These meetings followed a Koscot prepared script and were conducted in an atmosphere of enthusiasm and high-pressure salesmanship. The prospective purchasers were enticed to attend "Go-Go Tours" to the home of the corporation in Orlando, Florida where more pressure was brought to bear. At all of these meetings, statements were made by Koscot personnel of high profits which could be made by a person who was a distributor, sub-distributor or retail seller. None of these statements were ever substantiated to the prospective purchasers. Koscot sales meeting emphasized the profits expected to be made from the "sale of distributorships" vis-a-vis profits from the sale of the product. The Koscot system tended to bring into its organization large numbers of persons who were destined to failure and economic loss. We remind the reader that these court-made findings of fact were not appealed and remain, therefore, conclusive for our review. From these findings, the lower court concluded that Koscot had indeed violated the Act. Pertinent portions of Section 2 of the Act, 73 P.S. §201-2, provide the following definitions:

"(4) 'Unfair methods of competition' and 'unfair or deceptive acts or practices' mean any one or more of the following:

. . . .

"(xii) Promising or offering to pay, credit or allow to any buyer, any compensation or reward for the procurement of a contract of purchase with others;

"(xiii) Engaging in any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding."

In July of 1971, James Tolleson, a resident of Florida, became the "State Staff Advisor" of Koscot. By his own testimony in this case, he was responsible for all of the activities of Koscot in the Commonwealth from that time through the dates pertinent thereto. Rodney Tolleson, at about the same time, also became involved in the operation of Koscot and held several titles until he was promoted to the title of "sales manager for the sale of Koscot distributorships." At some point in time not clear from the record, after July of 1971, James Tolleson organized "Americans Be Independent," an unregistered unincorporated sales organization which was described by the Tollesons as the exclusive agent for the sale of distributorships of Koscot in Pennsylvania. James Tolleson declared himself the "Chairman of the Board," and Rodney Tolleson became "Sales Manager" of Americans Be Independent.

On October 4, 1972, the Commonwealth filed a Petition for Civil Penalties and Modified Injunction, in which it was alleged that Koscot and its agents had wilfully disregarded the lower court's order of March 25, 1971 and had continued to violate the Act by selling distributorships subsequent to the order of the lower court to "no less than 272 Pennsylvania citizens." In the Commonwealth's petition, there are three specific references to the Tollesons, which for clarity are here quoted:

"9. The said Koscot Interplanetary, Inc. operates in the Commonwealth of Pennsylvania through James E. Tolleson and Rodney W. Tolleson and others, and through an organization known as American Be Independent.

"10. Attached hereto and made part hereof, as Exhibit 'A', is a brochure of James E. Tolleson under

the caption, 'American Be Independent', which has been delivered to over 1000,000 [sic 100,000] citizens of the Commonwealth of Pennsylvania.

"11. Said Koscot acting through James E. Tolleson and Rodney W. Tolleson and American Be Independent and others violate the Order and Decree of this Honorable Court and the Law of the Commonwealth of Pennsylvania, among others, in the following ways . . . ." In the prayer of this petition, the court was requested to enjoin all the activities of Koscot and its "representatives, agents, servants and employees, including James E. Tolleson and Rodney W. Tolleson, American Be Independent and all other persons connected with" Koscot.

On October 6, 1972, the court below, because it was convinced that the welfare of the citizens of the Commonwealth required it, further ordered Koscot "its representatives, agents and employees, including American Be Independent, James E. Tolleson and Rodney W. Tolleson and all other persons" to cease and desist all activities in the Commonwealth except the retail sale of Koscot products. In the same order, the court set a date for a hearing. The court also ordered service to be made upon three attorneys for Koscot. The Commonwealth served each attorney with a copy of the petition and the order as required. In addition, the Commonwealth served (by registered mail) James E. Tolleson, Rodney W. Tolleson and American Be Independent.

At this point, we reach one of the Tollesons' contentions. At the time the appeal was made to this Court, the proof or affidavit of service had not been filed with the court below. This fact was not mentioned either at the hearing on the petition or by the court in its adjudication. After the appeal was taken, the Commonwealth on August 16, 1973, filed with the lower court the affidavit of service, including photocopies of the

return receipt cards indicating that the Tollesons were served at their place of business in Allentown, Pennsylvania. This affidavit of service was then certified to this Court as a part of the record. Although the Tollesons contend that this late filing of the affidavit of service constitutes a procedural flaw, they do not deny that they received notice of the hearing and a copy of the petition and order. Therefore, we hold that under the facts of this case the filing of the affidavit of service, albeit late, cures any possible defect on service. *See* Pa. R. C. P. No. 126.

The hearing on the petition was held before the same judge of the court below who had issued the original injunction. The record indicates that the Commonwealth submitted evidence in support of its petition through 15 witnesses. The first witness called was James Tolleson. There is nothing in the record to indicate whether he was called as for cross-examination or whether he was represented by counsel. In any event, no one objected. His testimony clearly supports the findings and conclusions of the court below that James Tolleson's activities in behalf of Koscot in Pennsylvania after July of 1971 were in violation of the court's order of March 25, 1971. Furthermore, James Tolleson's testimony indicates an awareness of said order. Rodney Tolleson was called as the first witness for the respondents. His testimony likewise supports the court's findings and conclusions concerning violations of its prior order. Our very careful review of the entire transcript of the hearings on this petition permits us to conclude that all of the findings of fact and conclusions of the court below are amply supported by the record.

It is also of interest to note that Koscot did not appeal from the lower court's order of January 18, 1973 leveling civil penalties in the amount of $55,000 against it and the Tollesons. In their appeal to this Court, the

Tollesons raise only one issue, i.e., the court below erred in levying civil penalties against the Tolleson brothers because the court below lacked personam jurisdiction over them. Americans Be Independent is mentioned only in the caption and nowhere in the body of the Tollesons' brief. The Tolleson brothers argue that the court below did not obtain jurisdiction over them because they were not made "parties" to the suit, and that the only way which the court below could obtain jurisdiction over them was by way of a petition and rule brought under an original process. We are dealing here with a novel issue for which we can find no precedent. We are dealing with an action in the nature of a contempt proceeding which is based upon a statutorily provided method of enforcement known as civil penalties. The pertinent provisions of the Act are found at Section 8, 73 P.S. §201-8, wherein it is provided: "Any person who violates the terms of an injunction issued under section 4 of this act shall forfeit and pay to the Commonwealth a civil penalty of not more than five thousand dollars ($5,000) for each violation. For the purposes of this section the court of common pleas issuing an injunction shall retain jurisdiction, and the cause shall be continued; and, in such cases, the Attorney General, acting in the name of the Commonwealth of Pennsylvania, may petition for recovery of civil penalties."

The Section 4 referred to in Section 8 provides that the Attorney General may bring an action in the name of the Commonwealth to seek an injunction to restrain any person the Attorney General has reason to believe is using or is about to use any method, act or practice declared to be unlawful by the Act. The Statutory Construction Act of 1972, 1 Pa.S. §1903, directs us to follow the plain meaning of any statute. The clear and plain meaning of the statutory wording of Section 8 is that "any person" who violates the terms of an in-

junction issued under the provisions of this Act, may be charged with civil penalties. The definition of the word "person" contained in Section 2 of the Act, 73 P.S. §201-2, does not contradict that conclusion. The legislative language does not restrict civil penalties to the "parties," but rather permits civil penalties to be levied upon "any person."

As we have already noted, this case is in the nature of a contempt proceeding, although it is not exactly the same as the typical contempt cases discussed and described in *Brocker v. Brocker,* 429 Pa. 513, 241 A. 2d 336 (1968). The case at hand involves enforcement of an injunction order through the specific methods held out in Section 8 of the Act, i.e., civil penalties. We agree with the Tollesons that they are entitled to all of their due process rights in any proceeding brought for the purpose of seeking statutory civil penalties. We disagree with the Tollesons, however, that it is necessary for the Commonwealth to initiate a new action so as to obtain in personam jurisdiction. Enforcement of an injunctive court order may be brought in a proceeding filed as a continuation of the proceeding in which the original injunctive action was sought, thereby permitting the utilization of the original caption of the suit. *See Knaus v. Knaus,* 387 Pa. 370, 127 A. 2d 669 (1956). We reiterate that all of the elements of due process must be afforded to any person against whom civil penalties for violation of the injunctive order are sought. We have previously set forth our understanding of those requirements in *Pittsburgh Press Employment Advertising Discrimination Appeal,* 4 Pa. Commonwealth Ct. 448, 457, 287 A. 2d 161, 166 (1972), where we stated: "The ingredients of due process have been discussed in a multitude of judicial opinions. A reading of many of these cases confirms our understanding that due process of law is afforded when (1) the 'accused' is informed with reasonable certainty of

the nature of the accusation lodged against him, (2) he has timely notice and opportunity to answer these charges and to defend against attempted proof of such accusation, and (3) the proceedings are conducted in a fair and impartial manner."

Our review of the entire record made in this case permits us to conclude that all of these elements of due process have been met. The record indicates that the Tollesons and Americans Be Independent were served with a copy of the petition and order, specifically setting forth the alleged violation of the injunctive order and specifically naming them as having been the persons who committed such violations. The Tollesons make no contention that they did not have sufficient timely notice, and they certainly had the opportunity to defend against the Commonwealth's proof, as is evidenced by the fact that they appeared as witnesses at the trial. The Tollesons made no objection to having counsel of their principal, Koscot, represent them. In fact, no objection was raised by the Tollesons at any place in the proceedings. Our reading of the Tollesons' testimony permits us to conclude that rather than weakening the allegations of the petition, their testimony lends support to the Commonwealth's case. Lastly, the Tollesons do not contend that the proceedings were conducted in an unfair or biased manner, and our reading of the record would not support any such contention.

In the face of all of this, the Tollesons still contend that they were not "parties," and therefore, the court did not have personam jurisdiction over them and could not order civil penalties against them. If the Tollesons are correct in this contention, then it would be impossible for a court ever to enforce an injunctive order against a corporation such as Koscot. Certainly, even the Tollesons must recognize that a corporation acts only through its officers, agents, representatives and employes. An injunctive order against a corporation

can be enforced by enforcement proceedings against officials of the company who know of the order and who thereafter violate it. *See Federal Trade Commission v. Standard Education Society,* 302 U.S. 112 (1937). *See also Scranton City v. Peoples Coal Company,* 274 Pa. 63, 117 A. 673 (1922).

As noted above, Judge CARNEY'S order enjoined all of Koscot's representatives, agents and employes. The record in this case indicates that the Tolleson brothers and the unregistered organization they created, viz., Americans Be Independent, took over complete control of Koscot's operations in Pennsylvania after July of 1971. The record also indicates that they were aware of the existence of Judge CARNEY'S March 25, 1971 order. Furthermore, they never asserted that they were either unaware of the order or that they did not understand it. It should be noted that the Tollesons have not raised any question on the merits concerning these violations. Instead, in their own testimony, they described a course of action which was in direct violation of the injunctive order.

In summary then, in affirming the order levying civil penalties against the Tollesons, we hold that they were persons who violated the terms of that court's prior injunctive order, that all of their due process rights were protected as evidenced by this record, and that the court below had personam jurisdiction over them, which permitted it to issue the subject order. Affirmed.