773 P.2d 490

STATE of Arizona, ex rel. Robert K. CORBIN, Attorney General, Plaintiffs–Appellees,

v.

James Edwin TOLLESON and Success Education Training Company, Defendants–Appellants.

Nos. 1 CA–CIV 8999, 1 CA–CIV 9898 and 1 CA–CIV 88–079.

Court of Appeals of Arizona, Division 1, Department A.

April 6, 1989.

Reconsideration Denied May 30, 1989.

Robert K. Corbin, Atty. Gen. by Patrick M. Murphy, Chief Counsel, Financial Fraud Div., and Marjie A. Patterson, Frank L. Murray, Asst. Attys. Gen., Phoenix, for plaintiffs-appellees.

C. Steven McMurry, Phoenix, for defendants-appellants.

## OPINION

FIDEL, Judge.

James Tolleson appeals from an injunction prohibiting the sale of his "Future Millionaires" home video course. Tolleson promoted the course as one that trains the purchaser to become a millionaire. The state charged Tolleson with consumer fraud and racketeering, and the trial court enjoined Tolleson's sale of this or any other motivational course. Tolleson claims that the injunction violates his First Amendment rights. We agree and set aside the trial court's order.

## I. CONSOLIDATION OF APPEALS

This appeal consolidates three. In the first, designated 1 CA–CIV 8999, Tolleson appealed the trial court's issuance of a preliminary injunction.[1] While we had that appeal under advisement after briefing and oral argument, the trial court issued a permanent injunction, identical in all material respects to the preliminary injunction, and also granted the state's motions for summary judgment.[2] Appeal 1 CA–CIV 9898 is from the permanent injunction; appeal 1 CA–CIV 88–079 is from the trial court's order of summary judgment for the state. The latter appeals were consolidated with the first, and the parties were permitted further briefing and oral argument.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Tolleson (the appellant) and his co-defendants (not appellants) sell "The James E. Tolleson Future Millionaires Home Study Course on Empire Building" (hereinafter "course"). To market the course Tolleson conducts free seminars at local hotels and motels, advertising the seminars in the "business opportunities" section of the local paper. Attendees receive free introductory audio tapes, which consist mostly of Tolleson's speeches from other seminars. The entire course, which sells for $4500 plus $270 sales tax, consists of approximately 360 hours of audio and videotaped lectures. Buyers are encouraged to earn commissions by selling the course to others.

In October of 1985, the state filed a consumer fraud and racketeering complaint against Tolleson and his associates and sought a preliminary injunction pending outcome of the suit. The state alleged in its first amended complaint that the defendants had falsely and deceptively represented the course to consumers. The state also alleged that the defendants had advised prospective purchasers to falsify income information on applications for financing to purchase the course, had verified such falsities, and thereby had acted for financial gain in a scheme to defraud. The state further alleged that the defendants operated an illegal enterprise and had failed to pay state sales tax collected from their customers. The state sought preliminary and permanent injunctions to prevent the defendants from soliciting for the sale of the course, from engaging in any deceptive practice, and from disposing of any course-related assets or records. The complaint also sought treble damages, restitution for the victims, costs, and attorneys' fees.

The Honorable Thomas W. O'Toole held a six-week hearing on the state's application for a preliminary injunction. More than 33 witnesses testified, more than 100 exhibits were introduced, and more than 2000 pages of transcript were generated. Although the state introduced evidence

---

1. Tolleson filed a motion for reconsideration with the trial court and an appeal from the preliminary injunction with this court. The trial court denied the motion for reconsideration, and Tolleson appealed that denial in 1 CA–CIV 9000. This court, in *State v. Tolleson*, 152 Ariz. 376, 732 P.2d 1114 (App.1986), dismissed 1 CA–CIV 9000, ruling that the trial court lost its jurisdiction to reconsider its preliminary injunction once the appeal had been filed.

2. Pursuant to Rule 62(c), 16 A.R.S. Arizona Rules of Civil Procedure, the trial court has discretion to "suspend, modify, restore, or grant an injunction during the pendency" of an appeal from an interlocutory order granting a preliminary injunction.

that the defendants sold the course through a number of false, misleading, and deceptive sales techniques, it never offered the course itself into evidence. The state offered the testimony of a few customers who had attended seminars and then purchased and listened to the course. Excerpts of the course and testimony about its contents were offered mainly by the defense.

The trial court issued a preliminary injunction on March 14, 1986. The relevant provisions are these:

[Defendants] are hereby enjoined ... from directly or indirectly:

1. Selling or offering to sell the James E. Tolleson Future Millionaires Home Study Training Course on Empire Building ... or any other motivational course.

....

IT IS FURTHER ORDERED that the term "motivational course" shall include any audio tapes, video tapes, written materials or verbal statements which purport to instruct, assist or help motivate a person to increase his or her income or net worth.

The trial court found that the defendants had made various misrepresentations in their efforts to sell the course; the court also noted the evidence that the course had not helped anyone achieve financial success; the court made no finding, however, regarding the contents of the course. The court did not find that the course consisted of commercial speech; nor did it find the course itself, as distinguished from its promotion, misleading.

Tolleson appealed from the preliminary injunction. While that appeal was pending, the suit was transferred to the Honorable Frederick J. Martone. Without further evidentiary proceedings, Judge Martone granted the state's motions for summary judgment on liability, forfeiture, and damages, and issued a permanent injunction, identical in all material respects to the preliminary injunction.

Tolleson does not dispute the trial court's findings that defendants used deceptive and fraudulent sales techniques and adver-

tising. Neither has he appealed from that part of the injunction that prohibits deceptive sales promotions, including seminars and tapes aimed at selling the course. Tolleson argues, however, that the trial court had no valid basis to enjoin the sale of the course itself and no valid basis to enjoin the sale of any other motivational course. Additionally, he challenges summary judgment on the issue of liability, claiming that the First Amendment requires a heightened showing of intent in consumer fraud and racketeering cases when the product involved is speech.

### III. THE FIRST AMENDMENT AND THE INJUNCTION OF COMMUNICATION

#### A. *Waiver*

■ As a preliminary matter, we reject the state's argument that Tolleson is precluded from invoking the First Amendment on appeal. Although the state contends that he failed to raise this issue in the trial court, Tolleson expressly opposed the state's application for a preliminary injunction on First Amendment grounds. He stated:

We contend that James Tolleson, Bryan Riddle, Rene Riddle, Patricia Allen and *every other citizen* of this country has the right under the First Amendment of the Constitution to stand up and give his opinion, give his advice, and tell people that there is the possibility that they can become a millionaire in America today.... The State argues that even "claiming possibilities" is against the law! ... If this is true then we need to prosecute every teacher, preacher, speaker or author who ever tells [an] adult or child that in America you *can* become anything (including a millionaire) you decide to become! Just because the assistant to the Attorney General has a different opinion does *not* make it illegal to say it.

....

[W]e ask, how can [the assistant Attorney General] file charges in *this* case when neither she nor any of her agents

or investigators heard *even the minimum required 12 hours* or read any of the company's literature? Furthermore, how can a judge make a judgment? (Emphasis in original.)

Tolleson raised timely First Amendment objections to the preliminary injunction; he reiterated these objections in opposing the entry of permanent injunction; we find no waiver of the issue on appeal.

**B.** *The Evidence Was Inadequate to Enjoin Publication of the Course*

■ The state has the burden of proof when it sets out to censor speech. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 560, 95 S.Ct. 1239, 1247, 43 L.Ed. 2d 448 (1975).

To justify an outright ban of publication of the entirety of Tolleson's course, the state was obliged to prove (1) that the course was wholly commercial and (2) that it was wholly deceptive. This burden the state did not carry. To justify a partial ban, the state was obliged to prove that extricable components of the course were wholly commercial and wholly deceptive. This burden the state did not attempt to carry. These failures in the state's proof result in our reversal. To explain our holding, we first summarize some principles in the law of free expression:

**1. Some First Amendment Principles:**

a. *Exacting scrutiny of content-based regulation of speech:* The Constitution requires the court's most exacting scrutiny when the state seeks to regulate speech based on content. *Widmar v. Vincent,* 454 U.S. 263, 276, 102 S.Ct. 269, 277, 70 L.Ed.2d

440 (1981). Freedom of speech "is the matrix, the indispensable condition, of nearly every other form of freedom," *Palko v. Connecticut,* 302 U.S. 319, 327, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), overruled on other grounds, *Benton v. Maryland,* 395 U.S. 784, 794, 89 S.Ct. 2056, 2062, 23 L.Ed.2d 707 (1969). "[F]ree speech is the rule, not the exception." *Dennis v. United States,* 341 U.S. 494, 585, 71 S.Ct. 857, 905, 95 L.Ed. 1137 (1951) (Douglas, J., dissenting).

b. *Commercial speech is constitutionally protected but to a lesser degree than "core" speech:* The Supreme Court has determined that the First Amendment "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."[3] *Central Hudson Gas v. Public Service Comm'n of N.Y.,* 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980). Yet even in commercial speech cases the court has rejected a "highly paternalistic" regulatory approach and has reiterated the fundamental constitutional philosophy that "people will perceive their own best interests if only they are well enough informed, and ... the best means to that end is to open the channels of communication rather than to close them...." *Id.* at 562, 100 S.Ct. at 2349, quoting *Virginia State Board of Pharmacy Board v. Virginia Citizens Consumer Council,* 425 U.S. 748, 770, 96 S.Ct. 1817, 1829, 48 L.Ed.2d 346 (1976).

■ c. *Unprotected commercial speech:* Within the broad category of commercial speech, the Supreme Court has isolated two forms of commercial messages that forfeit First Amendment protection:

---

**3.** Tolleson asserts his free speech rights under the First Amendment to the U.S. Constitution. He has not claimed rights under the free speech provision of the Arizona Constitution, which guarantees that "[e]very person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." Ariz. Const. art. II, § 6. Our supreme court has said that Arizona's free speech provision is broader than the First Amendment, and has directed that, "whenever a right that the Arizona Constitution guarantees is in question[,] we first consult our constitution." *Mountain States Telephone & Telegraph Co. v. Arizona Corp.*

*Comm'n,* 160 Ariz. 350, 356, 773 P.2d 455, 461 (1989).

This case involves issues of commercial speech. Had counsel asserted rights under the Arizona Constitution, we would be compelled to decide whether Arizona's free speech provision entails the distinction between core and commercial speech that has developed in federal case law. Because that issue is not presented, however, we proceed solely under the First Amendment and in accordance with the commercial speech guidelines articulated by the U.S. Supreme Court.

those that deceive the public and those that propose an illegal transaction. To whatever extent a *commercial* message is deceptive or proposes an illegal transaction, it may constitutionally be banned. *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 638, 105 S.Ct. 2265, 2275, 85 L.Ed.2d 652 (1985).[4]

d. *Protected but regulable commercial speech:* Other forms of commercial speech are constitutionally protected, but may be regulated (1) when "the asserted governmental interest is substantial," (2) when "the regulation directly advances the governmental interest asserted," and (3) when the regulation "is not more extensive than is necessary to serve that interest." *Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351.

■ e. *Mixed commercial and non-commercial speech:* When speech has a mixture of commercial and non-commercial elements, the presence of the former does not diminish the constitutional protection of the whole. Rather, the state must demonstrate that the commercial component can be isolated for independent regulation without impeding the flow of non-commercial communication. Otherwise, as the Supreme Court stated last term:

> [W]here, as here, the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and an-

other test to another phrase. Such an endeavor would be both artificial and impractical. Therefore, we apply our test for fully protected expression.

*Riley v. National Fed. of the Blind of North Carolina,* 487 U.S. ——, ——, 108 S.Ct. 2667, 2677, 101 L.Ed.2d 669 (1988).

■ f. *Mixed deceptive and non-deceptive commercial speech:* Likewise, when determinably commercial speech has both deceptive elements and non-deceptive informative elements, the state has the burden "of distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful." *Zauderer,* 471 U.S. at 646, 105 S.Ct. at 2279.

g. *Summary:* These conclusions follow:

■ (1) If the commercial and non-commercial components of the Tolleson course are "inextricably intertwined," the course is entitled to full constitutional protection. *Riley,* 487 U.S. at ——, 108 S.Ct. at 2677. Fully protected "core" speech may not constitutionally be enjoined. *See generally, New York Times v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (The "Pentagon Papers" case).

(2) Only if the state can (a) prove the Tolleson course wholly commercial or (b) isolate commercial portions, and only if the state can further narrow its focus to (c) deceptive commercial portions or (d) those

---

**4.** If the course is "core" protected speech, however, no matter how deceptive or misleading, it cannot be enjoined.

> "The First Amendment is a value-free provision whose protection is not dependent on 'the truth, popularity, or social utility of the ideas and beliefs which are offered.' ... 'The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind.... In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us.' ..."

*Meyer v. Grant,* 486 U.S. 414, 108 S.Ct. 1886, 1891, 100 L.Ed.2d 425 (1988) (quoting *Grant v. Meyer,* 828 F.2d 1446, 1455 (10th Cir.1987) (citations omitted).

Likewise, if the course is core protected speech it cannot be enjoined, even if it promotes unlawful activity, unless the promotion were found to reach the level of incitement to immi-

nent lawless action with the likelihood to produce such action. *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). See also Justice Brandeis's concurrence in *Whitney v. California* in which he stated:

> [E]ven advocacy of violation, however reprehensible morally, is not a justification for denying free speech where the advocacy falls short of incitement and there is nothing to indicate that the advocacy would be immediately acted on....
>
> ... If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence.

274 U.S. 357, 376–77, 47 S.Ct. 641, 648–49, 71 L.Ed. 1095 (1927) (majority opinion overruled in *Brandenburg*). See also *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978).

that promote unlawful activity, can the state establish the validity of injunctive relief.

This burden is severe, given the enormous and expanding volume of the Tolleson course. However, the Supreme Court has recognized that "the line between speech unconditionally guaranteed and speech which may legitimately be regulated ... is finely drawn" and that "[t]he separation of legitimate from illegitimate speech calls for ... sensitive tools." *Blount v. Rizzi,* 400 U.S. 410, 417, 91 S.Ct. 423, 428, 27 L.Ed.2d 498 (1971) (citations omitted).

With these principles in mind, we examine the state's proof and the trial court's findings and conclude that both fell short of what was constitutionally requisite to sustain an injunction of the course.

### 2. Evidence and Findings at Trial

The state claims on appeal that the course is wholly commercial, that it does nothing more than encourage the purchaser to buy and sell the course itself, that the course is, in effect, only an ongoing advertisement for itself, and that it is wholly deceptive.

a. *The course was not in evidence:* The first impediment to this argument is the state's failure to place the course in evidence. Although the state introduced evidence that the defendant sold the course through a number of false, misleading, and deceptive sales techniques, it never placed the course itself before the court.

The state argues with good reason that it would have been enormously burdensome to itself and to the court to review 360 hours of taped material. The state does not admit the possibility, however, that the First Amendment may impose so large a burden when the state seeks to enjoin so large a block of speech. The state argues in effect that, based on segments and witness testimony alone, a court might characterize a work as entirely commercial, entirely deceptive, and entirely enjoinable, though the court has never considered the complete work. The state cites no authority for this proposition, and we know of

none. We need not decide that point, however, for even assuming the state might enjoin a work on such a lesser showing, the state made no such showing here.

b. *The record is unclear whether course segments were ever introduced, and, if so, whether they were introduced for content:* To begin with, the state placed certain promotional tapes before the court. These tapes were not presented as components of the course, but rather as materials that Tolleson used in his promotion of the course. Moreover, they were offered for limited purposes, not for content:

> The Court: I'm concerned that we're putting in the entire course, which, I understand, is hundreds of hours long, but whether any portions ... [are] relevant is another question. As I understand, you're [the state] offering the tapes only as to those portions which you consider relevant to the proceeding, and that you will connect those excerpts up through other witnesses. Is that correct?

> State's Counsel: Yes, it is.

> The Court: I don't want to limit you, but on the other hand, I don't want to be asked to sit and listen to twelve hours of tapes, or whatever it is.

> State's Counsel: I'm not requesting it. I don't expect the Court will have to listen to those tapes. That's why I have made an excerpt on limited portions that I believe illustrates misrepresentations made.

Defendant's counsel objected to the introduction of the tapes, citing lack of foundation by the witness.

> The Court: I think [defense counsel's] foundational objection is well taken at this point. I will admit the tapes only as being tapes [the witness] obtained, but I'm not admitting the substance of the tapes under my ruling. The substance if at all admitted will be admitted through other witnesses.... They're admitted only for the limited purpose of evidence of [the witness] attending this seminar and meeting Mr. Tolleson and obtaining these tapes. And the substance of the

tapes is not admitted. That goes for Exhibits 6 through 17.

No record entry thereafter indicates that any audio or video tapes were admitted into evidence for their substance. Mr. Tolleson himself asked the court to listen to the tapes during his *pro per* closing argument:

[T]his is a proposition we lay out in front of the Court. That the Court hear the whole course, or the twelve tapes.... [L]et the documents stand on their own, let the evidence stand where it is. ... See if there's anything on there that is misleading.... [Mr. Tolleson names the tapes] Over twelve tapes. That's the tapes they said there's misrepresentations [sic].

However, the record does not reflect that even the tapes mentioned by Tolleson in his closing were admitted into evidence for their substance.

■ c. *The evidence of witnesses did not establish the character of the entire course:* The state next argues that the witnesses described the contents of the course sufficiently to support a finding that the course consists entirely of commercial speech. We disagree.

Of the seven witnesses cited by the state to support this argument, four were called by the defense to express their satisfaction with the course. The state focused its cross-examination of these witnesses primarily on the promotional representations of the course and on how each witness had attempted to put the course's entrepreneurship lessons into practice. However, the state also questioned each witness concerning the contents of the course. One described it as encouraging "a positive attitude of thinking bigger ... and stretching your own mind." Another recalled that it encouraged a positive approach to business dealings—"selling a smile." Another recalled learning the "ready, fire, aim" sales technique, which he explained meant, "you set your goal, you initiate the transaction, and you adjust as necessary to achieve your goal." He also recalled the lesson that a winning business stresses service and product quality. A fourth stated, "I learned to negotiate with people and find out what they need. If I can help them get what they need, and at the same time accomplish my goal, we have both won."

■ Such lessons conveyed a philosophy of selling, but that is not to say they constituted commercial speech. To recommend a general approach to commercial transactions must be distinguished from proposing a specific commercial transaction. The latter is commercial speech; the former is not. *See, e.g., Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66, 103 S.Ct. 2875, 2880, 77 L.Ed.2d 469 (1983) ("the core notion of commercial speech [is] 'speech which does no more than propose a commercial transaction' ").

The state also cites three of its own witnesses to support the assertion that the course was entirely commercial (and deceptive) speech. Each was a dissatisfied purchaser who had unsuccessfully sought a refund of the purchase price from Tolleson. Each had purchased the course for $4500, persuaded that Tolleson's recorded speeches held the key to "millionaireship". All three testified in essence that the course did not provide what they expected; it did not teach them to be millionaires, and the only direct route it offered to make money was to sell the course to others.

The testimony of these three witnesses supports the state's allegation of deceptive *promotion*, but that allegation is one that Tolleson does not dispute. The testimony was insufficient, however, to support a finding that the course consists entirely of commercial speech. One of the state's witnesses did not listen to the entire course. A second said that, at least part of the time, she "listened" while she slept:

Q. [State's counsel]: ... [H]ow many hours does the course consist of in audio and video tapes?

A. I really don't know in hours, because I would plug in a tape and just let it go until it was gone, then plug in another tape and let it go.

Q. How many hours a day did you listen to it?

A. Well, I tried it on the fourteen hours.

Q. Why did you do that?

A. They said it soaks in better if I slept with it.

Q. Did they tell you to listen to it fourteen hours a day?

A. Yes.

Q. Did they tell you that would be the way that the tapes would work for you?

A. Yes, but I couldn't see what, you know, what they were doing. None of the tapes ever told me how to do anything on my business.

The third witness acknowledged on direct examination that the course contains more than mere commercial speech:

Q. What do the guest speakers speak about?

A. About motivation and about the course, and I guess that's about it.

Q. What does Mr. Tolleson speak about?

A. Motivation and experiences in his life, as far as in his younger life, his business experiences. Mostly about his life, how he's done, and that we could do the same thing.

Q. What did Mr. Riddle talk about?

A. Mostly about Mr. Tolleson.

Q. How about Mrs. Tolleson, what does she speak about?

A. Well, she speaks mostly about her life and how well she's done after she bought the course. And she speaks about Mr. Tolleson, and I think there's sometimes in there when she introduces other people, Mr. Riddle, you know. People that have bought the course, and they speak about how well they have done.

. . . .

Q. Did the speakers on the course say anything about how to increase your hourly income?

A. Yeah, mostly by selling the course.

Q. Did the speakers teach you any other ways to increase your income at all?

A. Oh, yes, by, you know, little things that you could do in your work to make you being more presentable to your employer. How you could make more money by being at your own job.

Q. Did they teach you how to run a small business?

A. Not me.

Q. Did any of the speakers on the course talk about how to run a small business?

A. Yeah, some phases of it.

Q. What did they say?

A. Well, mostly about how to get money to start a small business.

On such evidence, the state not only failed to prove that the course was entirely commercial speech; it proved to the contrary that at least portions were non-commercial and motivational or informative.

d. *The trial court's findings in preliminary injunction:* The trial court's findings similarly preclude our conclusion that the course was wholly commercial speech. Upon issuing the preliminary injunction, the trial court found that defendants had made various misrepresentations,

> either directly to prospective purchasers or in the literature and various introductory tapes, which guaranteed prospective purchasers substantial and quick earnings increases if they purchased [the course] and followed its directions.... No reasonable basis was shown to establish that these earnings goals were achievable and none of the refund or consultation guarantees were granted when dissatisfied purchasers sought such relief.

The court additionally commented that the state had presented evidence that the course did not in fact help anyone achieve financial success or "millionaireship," contrary to its promotional claims. But the court found neither that the course consisted of commercial speech nor that it was misleading in its content. In fact, the court did not discuss these First Amendment issues at all.

Later, explaining his preliminary injunction, Judge O'Toole described the course in terms that made it clear he did *not* regard it as wholly commercial:

> I have not enjoined the sale of the course. The course, however, in my opinion, could not be sold. Well, the

course is a motivational course, pure and simple. There are some portions of the course which, arguably, could be characterized as instructing people on how to [increase] their capacity to earn money. But that's an insignificant portion of the course. *I think to a large degree the course is motivational. It appeals to their patriotism and their desire to reach satisfaction and happiness.* It doesn't spend any substantial time on how to teach people to be millionaires. By definition, you cannot teach people to be millionaires.

....

I didn't address the course in my Order as an opinion of itself being misleading or deceptive. But I will state on the record that the evidence that I heard in this proceeding and the evidence that I reviewed which was offered into evidence leads to no other conclusion but that the course is as I have described it, and *it is not in any way a course which can reasonably be described as teaching a person how to be a millionaire.* I think it's fair to say that the title of the course is misleading, The James E. Tolleson Future Millionaire Home Study Training Course On Empire Building.

So, I didn't say it formally in my Order. I said it on the record.[5]

(Emphasis added.)

Although the state cites these comments as a finding that the course constitutes deceptive commercial speech, a careful reading reveals the contrary. The court found the *title* to be deceptive and the *promotion* to be deceptive, but not the course itself. Characterizing the course as largely exhortations toward patriotism and self-fulfillment, the court concluded that it could not fairly be *promoted* as a means to make the listener a millionaire.

e. *The trial court's findings in permanent injunction:* We turn from Judge O'Toole's findings in support of the prelimi-

nary injunction to Judge Martone's findings in support of the permanent injunction.

No further evidence was offered in the interim. The course, as before, was not before the court. Judge Martone, unlike Judge O'Toole, stated the conclusion that the course was commercial speech. He did not, however, purport to base this conclusion upon substantive review of the course, but rather upon the fact that the course was *sold.* He stated:

... Defendants' entire defense rests upon their claim that the First Amendment to the United States Constitution prohibits this Court from prohibiting them from selling or offering to sell their millionaireship course or any other motivational course. Defendants' claim is without merit. Defendants rely upon analogies to Jesus, the apostle Matthew, and the Christian promise of everlasting life.... Jesus and the apostle Matthew gave their ideas away. [The court's preliminary injunction] order does not prevent the Defendants from preaching or giving their ideas away. On the undisputed facts, the order prevents the Defendants *from selling a course* which is fraudulent, misleading, and constitutes a deceptive trade practice.

....

In contrast to the words of Jesus and the Apostle Matthew, the Defendant's speech is "commercial speech." ...

(Emphasis added.)

■ We need not explore the defendant's analogy to the teachings of Jesus and the apostles. We quote the trial court's comment because it reveals the erroneous conclusion that communication is relegated to the lesser protection of commercial speech merely because it is offered for sale. If this were so, every book, tape, movie, or newspaper sold by an author

**5.** The trial court made these comments at the conclusion of its hearing on defendants' motion for reconsideration. This court ruled in *State v. Tolleson,* 152 Ariz. 376, 732 P.2d 1114 (App. 1986) that the trial court had no jurisdiction to reconsider its preliminary injunction after the defendant had filed an appeal. However, the state has urged that we consider the court's explanation as instructive concerning the preliminary injunction it had entered, and we do so, though we find the court's explanation harmful, rather than helpful, to the state's position.

would constitute commercial speech. One is free to sell in the market of ideas.[6]

The Supreme Court has explained that: speech does not lose its First Amendment protection because money is spent to project it.... Speech likewise is protected even though it is carried in a form that is "sold" for profit....

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 761, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976) (citations omitted). *See also Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 501, 72 S.Ct. 777, 780, 96 L.Ed. 1098 (1952) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment").[7]

### 3. The Burden of Enjoining Speech

■ We conclude that the state did not prove that the course consists entirely of commercial speech. Judge O'Toole's findings, confirmed by the testimony we have reviewed, reveal a course composed at least in part of autobiographical ruminations, patriotic exhortations, and motivational platitudes. Such communication, whatever its value to a purchaser, is not within the state's or the trial court's power to enjoin.

We do not suggest in drawing this conclusion that the course is wholly non-commercial speech. The course evidently proposes commercial transactions to its purchasers, including that they sell the course itself to others. The state made no effort, however, to isolate such portions, prove them deceptive, and demonstrate that they could be separately enjoined.

The state comments both on the severity of such a burden and on the unlikelihood that a narrower injunction would succeed. We respond first to the severity of the burden. If the state's objection is that the commercial elements of the course cannot reasonably be extricated from the non-commercial remainder, the consequence is not to relegate the whole to the lesser protection of commercial speech but rather to cloak the whole in the full protection of core speech. *Riley,* 487 U.S. at ——, 108 S.Ct. at 2677. In *Riley* the Supreme Court found that the commercial components of charitable solicitation by charitable fundraisers were inextricably intertwined with "informative and perhaps persuasive [non-commercial] speech." The court concluded, "[W]e cannot parcel out the speech, applying one test to one phrase and another test to another phrase. Such an endeavor would be both artificial and impractical.

---

6. The concept of a market of ideas was advanced by Justice Holmes in *Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting):

But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out. That at any rate is the theory of our Constitution.

*See also Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969):

It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the government itself or a private licensee.

7. Judge Martone further explained his decision by stating:

The First Amendment is not abridged when a course of conduct is made illegal, merely because the conduct was in part carried out by language, whether it be spoken, written, or printed. *Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 456 [98 S.Ct. 1912, 1918, 56 L.Ed.2d 444] (1978). Examples in the law abound. *E.g.,* security fraud, proxy statement problems, copyright and trademark infringement. Thus, the State does not lose its power to make the Defendants' conduct illegal merely because speech is a component of that conduct.

While the proposition asserted by the trial court is correct, it provides only limited support for the court's injunction. Tolleson's advertising and promotions were proper targets of the court's injunction as "conduct ... carried out by language," because the state proved them to be deceptive commercial speech. However, the state failed to meet this burden as to the course, and, accordingly, the course could not be banned.

Therefore, we apply our test for fully protected expression." *Id.*

If the state's objection is not that the commercial components of the Tolleson course are inextricable, but only that their extrication would be highly burdensome, the answer is provided in *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985). There, the Office of Disciplinary Counsel of the Supreme Court of Ohio attempted to justify an outright prohibition on the use of legal advice and information in advertising by attorneys by citing the difficulty in weeding out accurate statements in lawyer advertising from those that are false, misleading, or ambiguous. The Supreme Court rejected that argument, stating:

> Were we to accept the State's argument in this case, we would have little basis for preventing the government from suppressing other forms of truthful and nondeceptive advertising simply to spare itself the trouble of distinguishing such advertising from false or deceptive advertising. The First Amendment protections afforded commercial speech would mean little indeed if such arguments were allowed to prevail. Our recent decisions involving commercial speech have been grounded in the faith that the free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful.

*Id.* at 646, 105 S.Ct. at 2279.

We turn to the state's argument that a more limited injunction would be unlikely to succeed. The state refers to Tolleson "as a fraud artist who has conducted the same or [a] substantially similar scheme over a period of decades." *See, e.g., Commonwealth v. Tolleson,* 14 Pa.Cmwlth. 72, 321 A.2d 664 (1974); *Commonwealth v. Tolleson,* 14 Pa.Cmwlth. 140, 321 A.2d 701 (1974); *Commonwealth v. Tolleson,* 14 Pa. Cmwlth. 164, 321 A.2d 713 (1974); *Americans Be Independent v. Commonwealth,* 14 Pa.Cmwlth. 179, 321 A.2d 721 (1974). The state argues that, given Tolleson's persistence in fraudulent conduct and the fluid, expanding nature of his course, an injunction would be ineffectual that failed to ban the course outright and, additionally, to ban the sale of all future motivational courses.

■■■■ We have not until now considered the portion of the preliminary and permanent injunction that prohibits Tolleson's publication of "any other motivational course." We do so now in the context of the state's recitation of Tolleson's past fraudulent conduct. We have commented on the state's failure to prove the contents of the present course. It should go without saying that the state did not and cannot prove the contents of a different course that is yet to be. When the trial court succumbed to the state's invitation to ban future, unproven communication by Tolleson, it committed a classic prior restraint of speech. *See e.g., New York Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971). Prior restraints of speech come to court with a heavy presumption of invalidity. *Id.* Absent a clear finding supported by the evidence that a given expression is unentitled to First Amendment protection, a prior restraint should not issue and cannot stand. The court cannot know what, if any, portion of Tolleson's future motivational courses might consist of deceptive commercial (and therefore unprotected) speech. Nor can it rely on Tolleson's fraudulent past activity to justify restraining his future speech. *See, e.g., Whitney,* 274 U.S. at 378, 47 S.Ct. at 649 (Brandeis, J., concurring) ("Among free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law, not abridgment of the rights of free speech ..."). *See also Near v. Minnesota,* 283 U.S. 697, 720, 51 S.Ct. 625, 633, 75 L.Ed. 1357 (1931) (one does not lose his "constitutional freedom from previous restraint" because of criminal charges against him). The state advances no colorable basis to enjoin defendants' sale of future motivational courses, and we find this portion of the trial court's orders wholly insupportable.

■ We return to the state's argument that it should at least be entitled to enjoin publication of the entirety of the present course, because a lesser order would be ineffective against as resourceful and persistent a fraud as Tolleson.

Judge Kramer of the Commonwealth Court of Pennsylvania faced this issue in a prior injunctive case involving Tolleson. He stated:

> [T]his court now faces the perplexing task of designing an appropriate permanent injunction order. It is perplexing because this record exposes the fact that the Tollesons and their enterprises tend to change with the wind. If we merely enjoin their many existing companies and organizations, and they follow their prior pattern, then they will form new organizations on the very next day, with new schemes and new products. The task is also perplexing because we know of no way a court effectively can protect citizens, or the buying public, from their own gullibility and greed.[8] *We also recognize that however we design the order, we cannot enjoin the Tollesons from legitimate endeavors.*

*Commonwealth v. Tolleson,* 321 A.2d at 699 (emphasis added).

Though the Pennsylvania court thus vented its frustration and acknowledged the limited efficacy of injunctive remedies against the enterprises of a Tolleson, it also acknowledged its constitutional limitations and confined injunctive orders to Tolleson's fraudulent sales techniques.

The state asks this court to go further. To achieve the maximal restraint, it seeks to enjoin the entire course, yet has not undertaken the burden of proving the character of the entire course. We cannot acquiesce. Our responsibility is not to tailor the First Amendment to fit the state's injunctive preference, but rather to require that the state restrain its choice of remedies to those that fit the First Amendment.

Available to the state within this case is an injunction against fraudulent promotional and advertising techniques. Tolleson has never disputed the validity of such a remedy. Also available are various post conduct remedies under the consumer fraud and racketeering statutes, as we will discuss in the following portion of this opinion. If such remedies are less efficient in restraining Tolleson than the overbroad injunction that was issued by the trial court, if such remedies are unlikely to *silence Tolleson,* they at least have the virtue of constitutional compatibility. As the Supreme Court stated last term in *Riley,* "the First Amendment does not permit the state to sacrifice speech for efficiency." 487 U.S. at ——, 108 S.Ct. at 2676.

We conclude that the preliminary and permanent injunctions were unconstitutional.

## IV. SUMMARY JUDGMENT CLAIMS

The state filed three motions for partial summary judgment in support of its consumer fraud and racketeering charges against Tolleson. The three motions respectively treated issues of liability, damages, and forfeiture. Tolleson disputed none of the facts asserted in the motions for summary judgment; nor does he do so in this appeal. His sole argument is grounded in the First Amendment. He proposes, without citation to any relevant authority, that, when speech is the "product," racketeering and consumer fraud actions can be brought only if the state shows both that defendant had the specific intent to defraud and that consumers actually relied on defendant's misrepresentations. He further claims that his First Amendment right to freely communicate is violated· by the forfeiture of his VCR machines, audio cassette equipment, and video and audio tapes and supplies; these, he argues, collectively constitute his "printing press," and their loss will directly impair and impede his ability to reproduce and disseminate his course. For reasons that

---

**8.** Judge Kramer's recognition of the court's limited capacity to protect the buying public from its own gullibility prompts recollection of a similar comment by Justice Jackson: "I doubt if the vigilance of the law is equal to making money stick by over-credulous people." *United States v. Ballard,* 322 U.S. 78, 94, 64 S.Ct. 882, 890, 88 L.Ed. 1148 (1944) (Jackson, J., dissenting).

follow, we affirm that portion of summary judgment predicated on consumer fraud grounds but reverse that portion predicated on grounds of racketeering and forfeiture.

### A. *Reliance*

■ Reliance is not an element of consumer fraud. *People ex rel. Babbitt v. Green Acres Trust,* 127 Ariz. 160, 168, 618 P.2d 1086, 1094 (App.1980). Nor is it an element of racketeering:

> Reliance on the part of any person shall not be a necessary element of the offense described in subsection A of this section.

A.R.S. § 13–2310(B). Nevertheless, Tolleson asks us to require proof of reliance when consumer fraud or racketeering cases target speech. This heightened showing is required, he suggests, to prevent a chill of First Amendment rights.

A flaw in Tolleson's argument makes it unnecessary for us to determine whether reliance need ever be proven in consumer fraud or racketeering cases that target speech. The flaw is this: On the undisputed facts of this case, Tolleson made deceptive and misleading statements to promote sales of his course. Those statements—false promotions and advertisements—underlie both the fraud and racketeering charges. Tolleson assumes by his argument that concededly deceptive commercial promotions retained some First Amendment protection. The law is to the contrary; as previously indicated, deceptive and misleading commercial speech lacks First Amendment protection altogether. *See Central Hudson,* 447 U.S. at 563, 100 S.Ct. at 2350. Tolleson has consistently argued that the course and the promotions for the course should be treated separately

under the Constitution. Because Tolleson's promotions and advertisements were concededly deceptive commercial speech, they lacked First Amendment protection and, like any alleged form of consumer fraud or racketeering, were actionable without a showing of reliance.

### B. *Intent to Deceive*

We similarly reject Tolleson's claim that the First Amendment requires a showing of a specific intent to deceive in *consumer fraud* cases. Tolleson never disputed that his misrepresentations in selling the course met the statutory definition of consumer fraud.[9] Intent to deceive is not required under the Arizona Consumer Fraud Act. *See State ex rel. Babbitt v. Goodyear Tire & Rubber Co.,* 128 Ariz. 483, 486, 626 P.2d 1115, 1118 (App.1981) (the only intent required is an intent to do the act involved). Because, as we have previously indicated, Tolleson's fraudulent promotions lacked First Amendment protection, we need not consider Tolleson's argument that First Amendment considerations require the extra showing of intent.

■ We reach a different result with respect to the charge of racketeering, though not on First Amendment grounds. The racketeering statute, unlike the consumer fraud statute, requires a showing of the specific intent to deceive.[10] *State v. Via,* 146 Ariz. 108, 116, 704 P.2d 238, 246 (1985); *State v. Haas,* 138 Ariz. 413, 418, 675 P.2d 673, 678 (1984). "Although intent to defraud cannot be presumed, it may be inferred from the facts." *Vern Walton Motors v. Taylor,* 121 Ariz. 463, 464, 591 P.2d 555, 556 (App.1979). The state's motion for summary judgment did not allege that Tolleson or his codefendants had the

9. Tolleson was charged with violation of A.R.S. § 44–1522(A) which provides:

> The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled,

deceived, or damaged thereby, is declared to be an unlawful practice.

10. Tolleson was charged with the following section of the racketeering statute:

> § 13–2310 A. Any person who, pursuant to a scheme or artifice to defraud, knowingly obtains any benefit by means of false or fraudulent pretenses, representations, promises or material omissions is guilty of a class 2 felony.

requisite specific intent to deceive. In his Response in Opposition to Motion for Partial Summary Judgment, Tolleson disputed the presence of the requisite intent:

> For purposes of responding to this Motion, Mr. Tolleson shall assume that the intentional non-payment of sales taxes could serve as part of a *prima facie* case of either consumer fraud or racketeering. On the other hand, if the non-payment was not intentional, then neither fraud nor racketeering is present; only a tax debt owed to the State. The attached Affidavits of both Mr. Tolleson and Mr. Riddle show that the non-payment in this case was not intentional.

"If factual inferences must be drawn in order to render judgment ... and reasonable minds could draw different inferences, summary judgment is not proper." *Vern Walton*, 121 Ariz. at 464, 591 P.2d at 556. In the absence of undisputed evidence of the requisite intent, we find an insufficient basis for the trial court's grant of summary judgment on the charge of racketeering.

We need not address Tolleson's First Amendment argument concerning forfeiture.[11] Because forfeiture was premised on a finding of liability under the racketeering statutes, that judgment must also be reversed.

### V. CONCLUSION

We set aside the preliminary and permanent injunctions as unconstitutional. We affirm the trial court's grant of summary judgment on the issue of liability under the consumer fraud act. All other orders are reversed and remanded to the trial court for further proceedings consistent with this opinion.

GRANT, P.J., and CONTRERAS, J., concur.

---

**11.** *But see Fort Wayne Books, Inc. v. Indiana,* —— U.S. ——, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989) (holding pretrial forfeiture of books under Indiana's racketeering statutes violated first amendment).